**PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS, Crittenton Hastings House & Clinic, Phillip G. Stubblefield, M.D., Jane Doe, and all others similarly situated, Plaintiffs,**

v.

**Francis X. BELLOTTI, Attorney General of the Commonwealth of Massachusetts; Alfred L. Frechette, M.D., Commissioner of Public Health of the Commonwealth of Massachusetts; and Newman Flanagan, District Attorney of the County of Suffolk, in that capacity and as a representative of a class of the District Attorneys for all other Counties, their agents, successors, those acting in concert with them, and all others similarly situated, Defendants.**

Civ. A. No. 80–1166–MA.

United States District Court, D. Massachusetts.

Sept. 2, 1980.

John H. Henn, Sandra L. Lynch, Foley, Hoag & Eliot, Boston, Mass., for plaintiffs.

Stephen S. Ostrach, Asst. Atty. Gen., Government Bureau, Boston, Mass., for State defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

In this class action for declaratory and injunctive relief, plaintiffs challenge the constitutionality of several elements of the 1980 Massachusetts act regulating abortions ("the Act").

The plaintiffs are Planned Parenthood League of Massachusetts, a counseling organization; Crittenton Hastings House and Clinic (Crittenton), a clinic providing abortion and abortion counseling services; Phillip G. Stubblefield, M.D., a physician who performs pregnancy terminations; and Jane Doe, an unmarried pregnant minor. They bring this action in their own behalf and as representatives of the separate classes of which they are members. The defendants are various state officials charged with the responsibility for the civil and criminal enforcement of the challenged statute. Relief is authorized by 42 U.S.C. § 1983 and 28 U.S.C. § 2201. This Court has jurisdiction under 28 U.S.C. §§ 1343(3) and 1331.

The record consists of affidavits, a partial stipulation of facts, and testimony including exhibits presented at hearing. Also submitted were portions of the transcript and depositions contained in the Appendix filed in *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). Finally, the Court was asked to take judicial notice of certain population figures, geographic locations and specific Massachusetts statutes pertaining to the administration of the state courts.

Plaintiffs here challenge only section 12S of the Massachusetts statutory scheme reg-

ulating abortions. M.G.L. c. 112, §§ 12K–12U. In its two paragraphs, § 12S imposed three sets of regulations: (1) a physician must obtain every woman's written consent 24 hours before the abortion on a form provided by the Department of Public Health and conveying certain information; (2) the physician must retain signed forms for seven years, then destroy them. The forms are confidential with certain exceptions; and (3) an unmarried minor, except in emergencies, must obtain either the consent of both parents (unless they are divorced or unavailable) or judicial authorization. Judicial authorization is to be granted after motion and hearing if the minor is found to be mature or if abortion is in her best interest.

We rule here on the plaintiffs' application for a preliminary injunction. In order to obtain temporary injunctive relief, plaintiffs must meet four criteria. The Court must find: (1) the plaintiffs have demonstrated a probability of success; (2) the plaintiff will suffer irreparable injury if the injunction is not granted; (3) the plaintiff's injury outweighs any injury to the defendant if the injunction is granted; and (4) the public interest will not be adversely affected by granting the injunction. *Morgan v. Kerrigan,* 509 F.2d 618 (1st Cir. 1975); *Automatic Radio Manufacturing Co. v. Ford Motor Co.,* 390 F.2d 113 (1st Cir.), *cert. denied,* 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968).

## I. THE BACKGROUND OF THIS STATUTE

The § 12S under attack here emerges from the series of federal district court, U.S. Supreme Court and Supreme Judicial Court cases which culminated in *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II*). That case re–affirmed the principles enunciated in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and refined in *Planned Parenthood v. Danforth,* 428 U.S. 52, 96

S.Ct. 2831, 49 L.Ed.2d 788 (1976) (*Danforth*). *Bellotti II* contained language that the former § 12S "satisfie[d] constitutional standards in large part," *id.* at 651, 99 S.Ct. at 3052. Section 12S was deemed to have satisfied constitutional requirements in providing for an (1) alternative procedure for authorization of minors' abortions, (2) disregard for parental objections not based on the minor's best interests, and (3) anonymity and expedition of proceedings under rule–making power of the state court which would not amount to a judicial veto. However, *Bellotti II* struck down § 12S on two grounds. The two areas which were found to be constitutionally impermissible intrusions upon the abortion decision were (1) parental notification or consultation in every instance, and (2) judicial withholding of authorization even though the minor was found to be mature and fully competent. In summary, the statute was struck down because in every instance, it subjected the minor's decision to an absolute third–party veto, either parental or judicial.

The present § 12S was drafted to address specifically these two objections, while retaining those provisions of the prior § 12S which were considered to have passed constitutional muster. In addition, the prior § 12S did not impose a waiting period and did not require written consent for women over eighteen years old. The present statute imposes those two additional requirements.

With this background in mind, we turn to the present § 12S.

## II. THE PRESENT STATUTE

Viewed against the further developments since *Roe v. Wade, supra,* and the direction furnished by *Danforth* and *Bellotti II,* we conclude that the plaintiffs have not submitted sufficient evidence to show a likelihood of success on the merits and, therefore, their motion for preliminary injunction must be denied. While ambiguities in the statute[1] could conceivably be

---

1. Certain provisions may be the subject of questions certified to the Supreme Judicial Court after consultation with the parties, who

have indicated that such questions would be helpful.

resolved so as to impose additional burdens on a patient's rights to consult freely with her physician and to choose an abortion, the ways in which the Department of Public Health (DPH) in its consent form [2] and the Chief Justice of the Superior Court, in his Standing Order No. 12–80, effective September 3, 1980 (which will be supplanted by formal rules), have implemented the statute, persuade us that the statute can be construed so as to protect the state's interest in the abortion decision without imposing an unconstitutional impingement. That interest is in assuring the integrity of the woman's decision, and, therefore, the state may require a written, informed consent. On the record presented here, this statute has been drawn and implemented narrowly to further that interest. The plaintiffs have failed to show that the statute imposes such burdens so as to outweigh the interest of the state even in the first trimester when the scrutiny is the strictest.

We now turn to an examination of each of the six specific provisions of the statute upon which plaintiffs focused their objections. We do not explicitly address the plaintiffs' equal protection argument at this time because sufficient evidence or argument has not been presented concerning state regulation of abortion as compared to other medical procedures. However, similar issues are raised in a substantive due process approach because of the compelling interest test applicable to first trimester abortion regulation. See discussion, *Womens Services, P. C. v. Thone*, 483 F.Supp. 1022, 1040–1044 (D.Neb.1979).

## 1. *Development of the Embryo*

■ The state clearly has a legitimate interest in assuring that a woman's decision to have an abortion is made of her own volition upon thoughtful consideration of relevant factors. Requiring her prior written consent is not *per se* unconstitutional, even when required only for abortions and not other medical procedures. *Danforth,*

428 U.S. at 65–67, 96 S.Ct. at 2839–40. However, the state may not mandate that such information be given as will "straightjacket" the physician in the practice of his or her profession. *Id.* at note 8; *Planned Parenthood of Kansas City v. Ashcroft*, 483 F.Supp. 679 (W.D.Mo.1980).

The form prescribed by the Commissioner of Public Health contains the following information for first trimester abortions:

*DEVELOPMENT OF THE EMBRYO*

The first trimester is defined as approximately the first twelve weeks of pregnancy.

In the first few days after conception, the fertilized egg divides into a mass of cells as it travels from the Fallopian tubes into the uterus (womb). It then implants in the lining of the uterus. The inner cell mass becomes the embryo while the outer cell mass ultimately develops into the placenta (afterbirth).

Four weeks after conception, the embryo is a little less than approximately half an inch in length and the cells are continuing to multiply and develop differently.

At eight weeks of development, the embryo is about one inch in length. Main organ systems are formed and some external human–like physical characteristics are recognizable. This differentiation continues through the twelfth week by which time the embryo is approximately 2½ inches in length crown to *rump.*

The information pertaining to second and third trimester abortions follows the same pattern, describing the embryo in terms of size and mass at certain times, and relating times at which heart beat, movement and full development is reached.

The plaintiffs object to the information because, in the opinion of their witnesses, the patients do not desire it and they fear it will have an adverse emotional effect on the patient. Dr. Stubblefield cannot say that his patients are informed about the stage of development because he does not

---

**2.** The Commissioner's form is not in strict conformance with the language of the statute, e. g., "unborn child" is replaced by "embryo." He

has presented the required information in clear, direct and understandable form, including a clarifying statement on public assistance.

feel it is indicated and does not do it. In his opinion, a small percentage, 1–3%, might change their minds if they read the DPH form. Occasionally, after the procedure is completed, some patients may ask the sex, and some may even ask to see the embryo.

Similarly, the clinics and counsellors avoid discussion of the stage of development. Their counseling language is couched in terms such as "tissue," or "fetal tissue," or "products of conception." One counsellor states that she would make every effort to avoid telling the patient about the physical characteristics of the embryo.

The defendants' position is that the information contained in the form is at the heart of the concept of informed consent; that without this information, the patient cannot be said to have a full understanding of her decision.

We believe the imparting of this information is properly required to allow the woman to reach an informed consent. If the woman is to have a full appreciation of the consequences and the significance of her decision, she should have at least the information set out on the DPH form. We understand the plaintiffs' motivation to avoid adding to an already stressful decision, but we cannot say that the decision is well–considered if no information at all is provided. The procedure followed at Pre–Term, an abortion clinic, reflects that no meaningful information is provided. If the initial contact is by phone, the patient is asked to provide a pregnancy test, and the date and results of a pelvic examination. She is asked for her last menstrual period, her age, marital status and employment. Finally, she is asked the referral source and any allergies. At the same time, she is provided with the following information: a description of the methods to be used and the fee. The patient is instructed to bring identification, a urine specimen, cash for prescription medicine, a sanitary belt, and insurance forms. She is told to eat a light breakfast, asked if she desires a follow–up examination and given an appointment time and date. Once at the clinic, the entire counseling and operative procedure

takes between 45 minutes to 1½ hours. The patient is aware that she is one of about 40 abortions scheduled every day, Tuesday through Saturday.

There is no discussion at any time concerning the importance of the decision unless the patient requests it or manifests some ambivalence. If ambivalence is shown, the counsellor is trained to examine the patient in an effort to resolve her feelings.

Under these circumstances, we conclude that the decision is made easier, but it cannot be considered an informed decision. It is meaningless to assert the state's interest in an informed consent and deprive that interest of the means to assure it. The record reflects the extent to which the plaintiffs shield the woman from this information. For example, in their efforts to discount the value of, or need for this type of information, the plaintiffs' evidence describes the 8 week old embryo as a largely undifferentiated cell mass. (Dr. Emans' Affidavit, Pl. Ex. # 10). But the Resource Manual (Pl. Ex. # 3) describes and illustrates the 8 week old embryo as largely developed, with head, arms and legs.

Further evidence helps to support our conclusion that a truly informed consent is needed. Even in the case of minors, chronological age does not affect the minor's ability to understand the nature of the abortion decision and to give an intelligent consent to such a procedure (Dr. Sturgis' testimony, Pl. Ex. # 1). The patient should be aware of all of the alternatives and implications of her decision. The abortion repeaters rate is high, about 25%, and is rising. Failure to resolve properly the unwanted pregnancy crisis can potentially arrest development progress. The message of pregnancy must be understood and taken seriously if repetition is to be avoided. (Dr. Nadelson's deposition, Pl. Ex. # 1, p. 567). Although the foregoing statements were made in the context of avoiding parental consent, we believe they have applicability here as well.

The cases in which provisions of this type have been stricken go far beyond this form.

In *Akron Center for Reproductive Health, Inc. v. City of Akron*, 479 F.Supp. 1172 (N.D.Ohio 1979), a similar section describes the embryo as a human child, and, in addition to anatomical and physiological characteristics, requires that the woman be informed as to

" . . . appearance, mobility, tactile sensitivity, including pain, perception or response, brain and heart function, and the presence of internal organs and the presence of external members."

Similarly, other cases go beyond the permissible limits of informing the woman. *See, e. g., Charles v. Carey*, 627 F.2d 772 (7th Cir. 1980), in which the woman is required to view materials provided by the state showing probable anatomical and physiological features of the fetus at various gestational ages. We can appreciate that such information and illustrative materials can impermissibly "straightjacket" the physician–client relationship and interfere unduly with the woman's decision.

There is no such "straightjacket" information here. The DPH form has replaced value–laden terms, such as "unborn child" with "embryo." The information provided is clear, easy to understand, and accurate. The Commissioner has done a commendable job of implementing the legislature's action.

The evidence persuades us at this stage of the proceedings that this information, in the form prescribed here, and placed in proper perspective by the physician in the entire abortion procedure, is relevant and important to an informed consent. *See Planned Parenthood Association v. Fitzpatrick*, 401 F.Supp. 554, 587–88 (E.D.Pa. 1975), *aff'd sub nom. Franklin v. Fitzpatrick*, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976).

### 2. *Procedures Available for Performing Abortions*

The DPH has satisfied the statute's requirement that consent forms contain information concerning "the type of procedure which the physician intends to use" by preparing a description of the procedures commonly used during the appropriate trimester. Not all FDA–approved procedures are described. Plaintiffs argue that this omission unduly burdens a woman's abortion decision and interferes with the physician-patient relationship in that a woman whose physician has prescribed an unlisted procedure will worry that the procedure is inadequate because it does not bear the imprimatur of government recognition. While such worry could possibly result, it does not rise to the level of an impermissible burden or interference. First, the physician may partially remedy that problem by explaining that the FDA, the government agency responsible for health, has recognized and approved the unlisted procedure. Second, we conclude that whether the procedure is listed will not be a major factor in a woman's decision. Of course, the physician is free to explain the details of the chosen procedure and its advantages over the listed procedures for the patient's particular pregnancy. It seems likely that good medical judgment would require such an explanation regardless of whether any information were provided by the state. Here, there is no requirement that includes a discussion of all possible procedures so that the abortion decision and the physician–patient relationship would be burdened by the great volume of information. The state's valid interest is to see that the woman is aware of the fundamental aspects of the procedures. Its impact on the decision is minimal. *Danforth, Planned Parenthood Association v. Fitzpatrick, supra.*

### 3. *Possible Complications Associated With the Procedure*

A disclosure of all possible complications is consistent with good medical practice and is consistent with the teaching of *Danforth* that such information is permissible to inform the woman of the nature and consequences of the decision. The goal of counseling is to make the patient fully aware so that an informed consent will be reached.

The evidence submitted by the plaintiff does not persuade us that such disclosure seriously intrudes upon the exercise of the woman's decision. This provision simply in-

sures that the woman will make a more fully informed decision, and thus, serve the state's legitimate interest. *Akron Center for Reproductive Health, Inc. v. City of Akron, supra; Wolfe v. Schroering,* 541 F.2d 523 (6th Cir. 1976).

### 4. *The Public Assistance Statement*

It has been held impermissible to require information be conveyed which is medically irrelevant to the abortion decision. *Charles v. Carey, supra; Planned Parenthood of Kansas City v. Ashcroft, supra.* The "public assistance" information could fall into that category, even if it were found not to be improperly motivated and misleading.

On the record here, we cannot say that the requirement is misleading and that it interferes with the woman's decision. Further development of the evidence in this regard may persuade us otherwise, but at this stage the evidence amounts to nothing more than a clear and unambiguous statement that the abortion decision will have no effect on eligibility for public assistance. Engaging in some cosmetic repair, the Commissioner has prescribed a form which says:

> I understand that whether I decide to have or not to have an abortion, that would not be a reason for the denial of public assistance.

This statement requires no discussion, elaboration, or legal advice from the physician. It does not imply any cutoff, nor does it suggest a reward. It would not create any distrust with the physician. A physician or his staff may often give similar advice to patients for other procedures as to their eligibility for Medicare, Medicaid or other insurance coverages. Further, it may clarify and ease the decision by removing the consideration of public assistance from the decision–making process. *Harris v. McRae,* —— U.S. ——, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). In the form prescribed by the Commissioner, the plaintiffs have not shown that the statement amounts to an unconstitutional impingement on the woman's decision.

### 5. *The Twenty–Four Hour Waiting Period*

This provision of the statute causes the greatest concern. Requiring a woman to wait 24 hours between signing the consent form and undergoing an abortion assertedly serves the state's interest in assuring that the abortion decision is made carefully after consideration of all the relevant facts. This is an important state interest considering the irreversible nature and possible lasting consequences of the abortion decision. *Akron Center for Reproductive Health, Inc. v. City of Akron, supra,* at 1204. However, the provision is subject to attack as an interference with the right to choose an abortion, which is unsupported by any compelling state interest, as it must be to justify burdening a woman's fundamental right to choose during the first trimester. Delay can burden the decision in several ways: increased costs through an extra visit to the physician and extra travel costs; it increases the age of the fetus, and hence, increases the risk in the medical procedures. Plaintiffs argue that most women consider the ramifications of the abortion decision carefully before their first visit to a physician, so the delay regulation is wholly unnecessary. Defendants argue that an informed consideration cannot be made until the physician has conveyed information concerning a particular patient's pregnancy and the medical techniques to be used, and the woman is given an opportunity to reflect upon that information.

Some courts have held waiting periods of 24 hours to 48 hours to be unconstitutional; *Women's Services, P. C. v. Thone, supra* (48 hours); *Planned Parenthood v. Ashcroft, supra* (48 hours); *Women's Community Health Center v. Cohen,* 477 F.Supp. 542, 551 (D.Me.1979) (48 hours); *Charles v. Carey, supra* (24 hours). Some have held that such a waiting period is constitutionally permissible, especially if it provides an exemption in the event of an emergency, such as is provided in § 12S. *Wolfe v. Schroering, supra* (24 hours); *Akron Center for Reproductive Health, Inc. v. City of Akron, supra* (24 hours).

We conclude that an informed decision cannot be properly made without sufficient time for reflection. The plaintiffs have not persuaded us that twenty–four hours is not a reasonable time to assure the state's interest in an informed decision. At the same time, they have not shown on the record here that the 24 hour waiting period is an unconstitutional burden on the woman's decision.

It cannot be gainsaid that any delay may increase risk, may result in increased costs and travel, and may add to the "stressful" decision. But the record presented here persuades us for the reasons stated below that any burden imposed by the waiting period does not constitute an impermissible interference with the woman's decision.

First, many of the facts and much of what was included in the earlier discussion on the development of the embryo is applicable here and we incorporate it here by reiterating that an informed consent not only requires sufficient information, but also a period of time in which to reflect upon that information.

Next, we examine the factual record. We judicially notice the geographic compactness of Massachusetts as compared with other states where waiting periods have been held unconstitutional, e. g., Maine, Illinois, Missouri and Nebraska (where the only abortion facilities available were located in Omaha). In Massachusetts, there are 54 hospitals, 7 clinics, 4 group practices, and at least 15 physicians where abortion procedures are available.

The hospitals are located throughout the state, including Nantucket. Of the 11 clinics and group practices available, 4 are in Boston, 3 in Cambridge and Brookline and the remaining 4 are located in New Bedford, Springfield, Amherst and Brockton. Thus, there are numerous facilities in geographically diverse areas available to the woman seeking an abortion.

Most women who seek abortions do so when 6–8 weeks pregnant, about 57%. Overall, about 70% are under 10 weeks pregnant and 30% over 10 weeks (Dr. Sturgis' testimony, Pl. Ex. # 1). At Crittenton, 20% of the patients are 10–12 weeks pregnant; at New England Women's Service, 15%; and at Pre–Term, 10%. Accordingly, while it is clearly desirable to perform the procedure as early as possible, these facts, together with the numerous available facilities, demonstrate that there is ample time so that a 24 hour delay will not add substantially to the risk. We can conclude that proper scheduling will minimize the delay and risk. 40% of the patients do not have abortions performed immediately. At one time, Crittenton followed a policy of requiring two visits before the procedure was performed. At Pre–Term, the time between the first call and the appointment varies between 48 hours to 1 week. Saturday appointments are always filled 2 to 3 weeks ahead, suggesting that the delay in itself *may not be as important* as the convenience of having the appointment on a Saturday.

The evidence further shows that approximately 22% of appointments do not appear as scheduled. Of those, a small percentage fail to keep appointments because they have changed their minds. Once at the clinic or facility, the average length of time the patient remains varies from 45 minutes to 1½ hours. This is not a sufficient period of time in which to receive the necessary information, absorb it, reflect on it and make an informed decision. Of course, the decision can be made and experience shows that when an ambivalent patient is faced with the prospects of having an abortion performed within the next hour, she is much better able to clarify her feelings with the assistance of trained counseling than at any other time. (Barasso Affidavit, Pl. Ex. # 9). However, we cannot say that the decision is an informed one. On the contrary, the importance of the woman's abortion decision is diminished.

As for increased expenses, additional cost alone does not constitute an undue burden. *Harris v. McRae, supra.*

Finally, in the event that the 24 hour waiting period is medically contra–indicated, that is, there is presented "an emergency requiring immediate action," the requirements of this provision are exempted.

In summary, we read this requirement in conjunction with the preceding provisions for an informed consent. Providing the information deemed appropriate in *Danforth* would serve little purpose if there were not some short period of time to reflect upon that information.

The record presented here is insufficient to allow us to conclude that the plaintiff has shown that the 24 hour waiting period makes a significant impact on the abortion decision. There may be certifiable questions concerning the method of notice which may resolve the problem of a second trip, increased costs and increased risk. Resolution of those questions can only work to the benefit of the patient.

### 6. *The Record Keeping Requirement*

This provision furthers the state's interest in collecting statistics for public health purposes. Such a provision is not impermissible if it furthers a legitimate state interest providing it is not overly burdensome or abused. There is no reason on this record to say that these regulations will be utilized and enforced in such a way as to constitute an undue burden through the sheer volume of record–keeping. *Planned Parenthood v. Ashcroft, supra* at 700. The impact here is minimal. Provision is made for confidentiality so that the privacy of the patient is assumed.[3] *Planned Parenthood v. Danforth, supra.*

### 7. *Other Provisions*

The plaintiffs focused on the 6 specific provisions discussed above. As to the other provisions not specifically addressed, we have examined the record and memoranda submitted and conclude that the provisions calling for a discussion of the alternatives to abortion and the confidentiality of the records do not amount to a burden on the abortion decision. Those provisions calling for parental consent or judicial authorization for unmarried minors do not, on the present record, constitute an unconstitutional burden on the abortion decision. The Standing Order assures that petitions will be acted upon in a speedy, efficient, confidential and sympathetic fashion.

### CONCLUSION

We read the statute as a whole, and conclude that the plaintiffs have not sustained the burden of proof which would entitle them to a preliminary injunction. Nor, we conclude, have they sustained their burden as to any one of the separate provisions specifically challenged.[4]

The plaintiffs' motion for preliminary injunction is denied.

So ordered.

---

3. An issue of construction may be posed when a minor's parent is unavailable at the time of the abortion, but later becomes "available" within § 12S and wants access to the records. This is the type of question which certification may help to resolve.

4. The defendants have suggested that severability is appropriate were this Court to conclude that any particular provision was constitutionally impermissible. Given our conclusion, we need not consider that question at this time, but have some doubt we should engage in ."judicial repair" in an area where there has been so much volatile and extreme reaction. We note that this Court has declined to do so on a previous occasion. *Baird v. Bellotti*, 450 F.Supp. 997, 1005 (D.Mass.1978).