(No. 53765.—

THE VILLAGE OF OAK LAWN, Appellant, v. STEWART MARCOWITZ, Appellee.

*Opinion filed June 26, 1981.—Modified on denial of rehearing October 19, 1981.*

408

Klein, Thorpe & Jenkins, Ltd., of Chicago (Gerald E. Dempsey and Sarah A. Hansen, of counsel), for appellant.

Lapat & Sokolow, Ltd., of Chicago (Michael Lapat and David Sokolow, of counsel), for appellee.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

Plaintiff, the village of Oak Lawn, filed a complaint in the circuit court of Cook County charging the defendant, Dr. Stewart Marcowitz, with operating an ambulatory surgical treatment center without a license in violation of a village ordinance. Dr. Marcowitz moved to dismiss, alleging the ordinance was unconstitutional, and the trial judge so held. We allowed the village's motion to transfer its appeal to this court.

The village's "Ambulatory Surgical Treatment Centers" ordinance is included as article IX of the village's code of ordinances relating to health and sanitation. It defines such centers by adopting the definition contained in the State act:

"The term ambulatory surgical treatment center shall have the same meaning as ascribed in the 'Ambulatory Surgical Treatment Center Act' of 1973 as now and here-

after amended. (Chapter 111½, Section 157—8.3 of the Illinois Revised Statutes)." Oak Lawn, Ill., Code of Ordinances, ch. 10, art. IX, sec. 10—141 (1979).

A center is defined under the Ambulatory Surgical Treatment Center Act:

"(A) 'Ambulatory surgical treatment center' means any institution, place or building devoted primarily to the maintenance and operation of facilities for the performance of surgical procedures or any facility in which a medical or surgical procedure is utilized to terminate a pregnancy, irrespective of whether the facility is devoted primarily to this purpose. Such facility shall not provide beds or other accommodations for the overnight stay of patients. Individual patients shall be discharged in an ambulatory condition without danger to the continued well being of the patients or shall be transferred to a hospital.

The term 'ambulatory surgical treatment center' does not include (1) any institution, place, building or agency required to be licensed pursuant to the 'Hospital Licensing Act', approved July 1, 1953, as heretofore or hereafter amended.

(2) any person or institution required to be licensed pursuant to 'An Act in relation to the licensing and regulation of homes for the maintenance, care, or nursing of persons who are ill, aged or physically infirm', approved July 17, 1945, as heretofore or hereafter amended;

(3) hospitals or ambulatory surgical treatment centers maintained by the State or any department or agency thereof, where such department or agency has authority under law to establish and enforce standards for the hospitals or ambulatory surgical treatment centers under its management and control;

(4) hospitals or ambulatory surgical treatment centers maintained by the Federal Government or agencies thereof; or

(5) any place, agency, clinic, or practice, public or private, whether organized for profit or not, devoted exclusively to the performance of dental or oral surgical procedures." Ill. Rev. Stat. 1979, ch. 111½, par. 157—8.3(A).

The ordinance in many other respects closely resembles the State act and implementing regulations adopted by the Department of Public Health. It requires detailed information regarding ownership and operation of a center; a description, including architectural plans, of the facility, and documentation of compliance with all applicable building and safety codes; a description of the services to be provided and the names, addresses, qualifications, and licenses of all personnel; requires the facility to be under the medical supervision of one or more physicians; permits surgical procedures to be performed only by a physician privileged to perform surgery in at least one Illinois hospital; requires at least $1 million liability insurance and notice to the village medical director of any change in staff, surgery performed, or ownership. An "organization plan" detailing duties and responsibilities of staff personnel must be submitted to the medical director and regularly reviewed, and a consulting committee must be appointed to establish and enforce professional standards. Physicians operating in the facility must be active staff members of a licensed hospital within 15 minutes' travel time or five miles. A policies and procedures manual must be prepared for approval by the consulting committee and must be followed at all times. In addition to the presence of a qualified physician, an experienced registered nurse and at least one person certified in "Basic Life Support" shall be on the premises while patients are present. Each facility must have either a certified medical technician to perform laboratory procedures or a written agreement with a licensed laboratory. The ordinance specifies certain equipment which must be available and certain standards to be maintained in preserving materials and supplies. Specific testing and procedures for pre-operative and post-operative care and record keeping are mandated. Only first-trimester abortions may be performed, and their performance requires specific testing, a

diagnosis of pregnancy based upon chemical and physical examination by the operating physician, a 24-hour wait between the initial examination and abortion, and pre-abortion counseling by qualified personnel. Pathological examination of all tissue removed during an abortion and a written report of the findings are necessary, together with a confidential report, to the medical director, of each abortion performed or attempted. There must be at least four inspections of a licensed facility each year, and licenses may be revoked for violation of ordinance provisions. Violators may also be fined $500 per day for each day a violation continues. A severability clause is included indicating an intent to enact any part of the ordinance remaining following a declaration of partial invalidity. An initial license fee of $5,000, plus annual renewal fees of $2,000, are required.

There is no doubt of the village's authority to enact ordinances imposing reasonable regulations for the purpose of protecting the health and safety of its residents. (*City of Carbondale v. Brewster* (1979), 78 Ill. 2d 111, *appeal dismissed* (1980), 446 U.S. 931, 64 L. Ed. 2d 783, 100 S. Ct. 2145 (ordinance requiring snow removal from sidewalk fronting property); *City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40 (special use permit for sheltered care home); *Schuringa v. City of Chicago* (1964), 30 Ill. 2d 504, *cert. denied* (1965), 379 U.S. 964, 13 L. Ed. 2d 558, 85 S. Ct. 655 (fluoridation of public water supply is reasonable exercise of police power).) The Ambulatory Surgical Treatment Center Act expressly recognizes the municipality's authority:

> "Nothing in this Act shall be construed to impair or abridge the power of municipalities to license and regulate ambulatory surgical treatment centers, provided that the municipal ordinance requires compliance with at least the minimum requirements developed by the Department pursuant to this Act." Ill. Rev. Stat. 1979, ch. 111½, par. 157—8.4.

Defendant urges, however, that the ordinance upon which the complaint against him is based is an unconstitutional restriction upon the decision by a woman and her doctor to obtain a first-trimester abortion; that it violates equal protection requirements in that it requires a permit for a facility in which a single abortion is performed, but does not require a license for a facility in which other surgical procedures are performed unless the facility is primarily devoted to that purpose; and that the ordinance is so vague and indefinite that defendant is unable to determine what type of conduct is proscribed. It is readily apparent, of course, from the definition of a center, that the ordinance requirements would be triggered by the performance of a single abortion. Since, on a motion to dismiss, all well-pleaded allegations in the complaint are taken to be true (*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540), and no evidence was presented as to the effect of these regulations upon the abortion decision, we are limited to a consideration of the validity of the ordinance on its face.

A review of the relevant decisions will be helpful. The United States Supreme Court has recognized that the fundamental right of privacy, including a woman's qualified right to terminate her pregnancy, is protected against State action under the fourteenth amendment. (*Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705; *Doe v. Bolton* (1973), 410 U.S. 179, 35 L. Ed. 2d 201, 93 S. Ct. 739.) *Roe v. Wade* stated a three-part test to determine the extent to which a State may regulate abortions:

"(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother,

may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

(c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." 410 U.S. 113, 164-65, 35 L. Ed. 2d 147, 183-84, 93 S. Ct. 705, 732.

The lower Federal courts originally interpreted this broad language as precluding almost any type of restriction upon first-trimester abortions. See, *e.g., Friendship Medical Center, Ltd. v. Chicago Board of Health* (7th Cir. 1974), 505 F.2d 1141, *cert. denied* (1975), 420 U.S. 997, 43 L. Ed. 2d 680, 95 S. Ct. 1438; *Word v. Poelker* (8th Cir. 1974), 495 F.2d 1349; *Nyberg v. City of Virginia* (8th Cir. 1974), 495 F.2d 1342.

Subsequent opinions of the Supreme Court, however, indicated that the lower court interpretations had been unnecessarily restrictive. That court has now recognized that States have an interest sufficiently compelling to justify some impingement upon the first-trimester-abortion procedure so long as no direct restrictions are placed upon the patient's and physician's decision to abort. In *Connecticut v. Menillo* (1975), 423 U.S. 9, 46 L. Ed. 152, 96 S. Ct. 170, it was recognized that a State may require that abortions be performed only by a licensed physician. The court stated, "*Roe* teaches that a State cannot restrict a decision by a woman, with the advice of her physician, to terminate her pregnancy during the first trimester because neither its interest in maternal health nor its interest in the potential life of the fetus is sufficiently great at that stage. But the insufficiency of the State's interest in maternal health is predicated upon the first trimester abortion's being as safe for the woman as normal childbirth at term, and the predicate holds true only if the abortion is performed by medically competent personnel

under conditions insuring maximum safety for the woman." 423 U.S. 9, 10-11, 46 L. Ed. 2d 152, 154-55, 96 S. Ct. 170-71.

In *Planned Parenthood v. Danforth* (1976), 428 U.S. 52, 49 L. Ed. 2d 788, 96 S. Ct. 2831, the court upheld portions of the Missouri abortion statute which required the woman's written consent prior to an abortion and also required record keeping and reporting of performed or attempted abortions with provision for the confidentiality and privacy of the patient. The court did not consider these provisions to impact in any legally significant way upon the abortion decision or the physician-patient relationship despite the fact that similar requirements did not exist as to other surgical procedures. In *Beal v. Doe* (1977), 432 U.S. 438, 53 L. Ed. 2d 464, 97 S. Ct. 2366, the court upheld Pennsylvania's refusal to extend medicaid payments to nontherapeutic abortions as not inconsistent with the Social Security Act. The State's interest in encouraging childbirth was considered sufficient to withhold funding of nontherapeutic abortions so long as there was no direct restriction upon the abortion decision. In a case decided the same day as *Beal* the court held there was no equal protection violation in Connecticut's refusal to fund nontherapeutic abortions although that State's policy was to pay expenses incident to childbirth. (*Maher v. Roe* (1977), 432 U.S. 464, 53 L. Ed. 2d 484, 97 S. Ct. 2376.) The court has also held that a State which participates in the medicaid program is not obligated under the Social Security Act to fund those medically necessary abortions for which Federal reimbursement was unavailable under the Federal law. *Harris v. McRae* (1980), 448 U.S. 297, 65 L. Ed. 2d 784, 100 S. Ct. 2671; *Williams v. Zbaraz* (1980), 448 U.S. 358, 65 L. Ed. 2d 831, 100 S. Ct. 2694.

In *H. L. v. Matheson* (1981), 450 U.S. 398, 400, 67 L. Ed. 2d 388, 393, 101 S. Ct. 1164, 1166, a Utah statute requiring a physician to "notify, if possible," the

parents or guardian of a minor upon whom an abortion was to be performed was unsuccessfully challenged. The pregnant minor who asserted the statute was overbroad in that it could be construed to apply to all unmarried minor girls, was held to lack standing since she failed to allege that she or any member of the class she purported to represent was mature or emancipated. The statute was found to serve important State interests, to be narrowly drawn to serve those interests, and not violative of any constitutional guarantee as applied to an unemancipated minor living with and dependent upon her parents and making no claim of maturity. We note, too, that the Supreme Court has affirmed without opinion the decision of a three-judge district court upholding an Indiana statute requiring hospitalization for all second-trimester abortions. *Gary-Northwest Indiana Women's Services, Inc. v. Bowen* (N.D. Ind. 1980), 496 F. Supp. 894, *aff'd sub nom. Gary-Northwest Indiana Women v. Orr* (1981), 451 U.S. 934, 68 L. Ed. 2d 321, 101 S. Ct. 2012.

Normally, the burden is initially upon one challenging a municipal ordinance to establish its unconstitutionality. (*Chicago v. Hertz Commercial Leasing Corp.* (1978), 71 Ill. 2d 333, *cert. denied* (1978), 439 U.S. 929, 58 L. Ed. 2d 322, 99 S. Ct. 315; *Coryn v. City of Moline* (1978), 71 Ill. 2d 194.) However, a statute or ordinance which impinges upon a constitutionally recognized fundamental right is presumptively invalid and is validated only if a compelling State interest for that action can be shown. (*Harris v. McRae* (1980), 448 U.S. 297, 312, 65 L. Ed. 2d 784, 801, 100 S. Ct. 2671, 2685; *Carey v. Population Services International* (1977), 431 U.S. 678, 686, 52 L. Ed. 2d 675, 685, 97 S. Ct. 2010, 2016; *Roe v. Wade* (1973), 410 U.S. 113, 155-56, 35 L. Ed. 2d 147, 178-79, 93 S. Ct. 705, 728, and cases there cited.) The fundamental right here involved, of course, is a woman's privacy right to decide in cooperation with her doctor whether to

obtain an abortion. As to those abortion regulations which do not unduly burden that fundamental right, the Supreme Court has applied only a rational-basis test. (*Bellotti v. Baird* (1976), 428 U.S. 132, 49 L. Ed. 2d 844, 96 S. Ct. 2857.) If the ordinance is "abortion neutral" and does not burden the first-trimester-abortion decision, or obstruct its effectuation, the village need only show a rational relationship to the legitimate State interest of protecting the health and safety of the woman. (*Planned Parenthood v. Danforth* (1976), 429 U.S. 52, 49 L. Ed. 2d 788, 96 S. Ct. 2831; *Baird v. Department of Public Health* (1st Cir. 1979), 599 F.2d 1098.) While it is clear that the woman's right to decide whether to abort may not be restricted during the first trimester, *Roe* and the post-*Roe* decisions also make clear the fact that regulations aimed at protecting the health and safety of individuals are valid if the regulations are reasonably related to this State interest, even though they apply to abortions as well as to other surgical procedures of similar complexity. Thus, in *Roe* the court held that a State may not burden the abortion decision or regulate the abortion procedure in the first trimester, but may regulate conditions under which abortions, like any other medical procedure, are performed. The court stated:

> "The State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient. This interest obviously extends at least to the performing physician and his staff, to the facilities involved, to the availability of after-care, and to adequate provision for any complication or emergency that might arise. The prevalence of high mortality rates at illegal 'abortion mills' strengthens, rather than weakens, the State's interest in regulating the conditions under which abortions are performed."

410 U.S. 113, 150, 35 L. Ed. 2d 147, 175, 93 S. Ct. 705, 725.

In *Planned Parenthood v. Danforth* it was stated that the *Roe* court "emphatically rejected, however, the proffered argument 'that the woman's right is absolute and that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses. [Citation.] Instead, this right 'must be considered against important state interests in regulation.' " (428 U.S. 52, 60-61, 49 L. Ed. 2d 788, 800, 96 S. Ct. 2831, 2837.) In *Baird v. Department of Public Health* (1st Cir. 1979), 599 F.2d 1098, upholding a Massachusetts clinic-licensure law, the court noted, "There is room under *Roe* for states to apply the same licensing standards to abortion facilities as they apply to like facilities performing medically analogous procedures, as long as they do not do so in a way that evades *Roe* by impinging on a woman's right to elect and obtain an abortion during the first trimester." (599 F.2d 1098, 1102. See also *Hodgson v. Lawson* (8th Cir. 1976), 542 F.2d 1350.) In upholding New York's health-service-facilities statute the United States district court cited *Roe* and *Connecticut v. Menillo* (1975), 423 U.S. 9, 46 L. Ed. 2d 152, 96 S. Ct. 170, stating, "Even as to the first trimester of abortion, then, the state has the power—and responsibility—to ensure that abortions are performed with due regard for the health and safety of the patient." *Westchester Women's Health Organization, Inc. v. Whalen* (S.D.N.Y. 1979), 475 F. Supp. 734, 739.

These decisions illustrate that first-trimester abortions are not immune from regulations which do not significantly burden the woman's decision and which have a reasonable relationship to the health and safety of the patients. The question, however, is whether defining a "center," as this ordinance does, to include any facility in which a single abortion is performed, is constitutionally permissible when other medically analogous procedures are

included within the ordinance only if the facility is primarily devoted to the performance of such procedures. The ordinance is certainly not "abortion neutral," as was the Massachusetts clinic-licensure statute upheld in *Baird*. Legislation which requires a permit and a substantial fee, and regulates in some detail a facility in which a single abortion is performed, but exempts facilities in which it is conceivable that 49% of the activity involves the performance of other, but not necessarily less hazardous, medical procedures is, in our judgment, simply incompatible with the Supreme Court's interpretation of equal protection and privacy standards. (*Planned Parenthood of Cent. Mo. v. Danforth* (1976), 428 U.S. 52, 67, 81, 49 L. Ed. 2d 788, 803-04, 811-12, 96 S. Ct. 2831, 2840, 2846; *Baird v. Department of Public Health* (1st Cir. 1979), 599 F.2d 1098, 1102; *Hodgson v. Lawson* (8th Cir. 1976), 542 F.2d 1350, 1357-58; *Friendship Medical Center, Ltd. v. Chicago Board of Health* (7th Cir. 1974), 505 F.2d 1141, 1152-53.) Put another way, the ordinance creates a class involving abortion surgery and another class involving nonabortion surgery. The ordinance would apply to a class of doctors and pregnant women simply because they are involved with abortion surgery, but would not apply to the class of doctors and individuals who are involved with nonabortion surgery even though it may be the more hazardous. There is apparent no rational relationship to any legitimate State interest for the unequal treatment which these classes receive under the ordinance. Whether viewed from the standpoint of the doctor's equal protection claim or the woman's privacy right, we believe that portion of the definition of an ambulatory surgical treatment center which relates to abortions cannot stand. It severely restricts the fundamental privacy right to secure a first-trimester abortion, and it does so in a manner not uniformly applicable to medically analogous surgical procedures. (*Doe v. Bolton* (1973), 410 U.S. 179, 199,

35 L. Ed. 2d 201, 216-17, 93 S. Ct. 739, 751; *Doe v. Hale Hospital* (1st Cir. 1974), 500 F.2d 144, 147; *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action* (8th Cir. 1977), 558 F.2d 861, 868 n.7.) Given the substantial licensing fee required and the detailed regulation involved, it seems inevitable that medical practitioners who might otherwise perform abortions for their regular patients, but whose facilities were not primarily devoted to surgery, would choose not to qualify under the ordinance. The right of a woman considering a first-trimester abortion to seek the advice and services of her obstetrician, gynecologist, or other physician in whom she has trust and confidence may not be so drastically curbed. In short, the effect of the ordinance is a form of anti-abortion discrimination clearly precluded by equal protection and privacy considerations. The village may have an interest in ensuring that abortion procedures are performed in the manner prescribed, but that interest is insufficient, under *Roe* and its progeny, to justify the unequal application of this ordinance. If in fact its purpose is the protection of the village residents through the regulation of surgical procedures, including abortions, that purpose can be constitutionally achieved by elimination from the ordinance of the impermissible portion of the provision defining an ambulatory surgical treatment center. We accordingly hold unconstitutional the following italicized portion of that definition as it is incorporated in the Oak Lawn ordinance from section 3 of the Ambulatory Surgical Treatment Center Act (Ill. Rev. Stat. 1979, ch. 111½, par. 157—8.3(A)):

> " 'Ambulatory surgical treatment center' means any institution, place or building devoted primarily to the maintenance and operation of facilities for performance of surgical procedures *or any facility in which a medical or surgical procedure is utilized to terminate a pregnancy, irrespective of whether the facility is devoted primarily to this purpose.*"

We are immediately confronted with the question whether the balance of the ordinance may stand with the invalid portion excised. Included in the ordinance is a severability clause declaring the legislative intent of the village president and board of trustees to adopt the remainder of the ordinance should any part of it be declared unconstitutional. (Oak Lawn, Ill., Code of Ordinances, ch. 10, art. IX, sec. 10—157 (1979).) While we have reservations regarding the conclusiveness of that clause (see *Akron Center for Reproductive Health, Inc. v. City of Akron* (N.D. Ohio 1979), 479 F. Supp. 1172) application of the ordinary severability test produces the same result. That test was stated in *City of Carbondale v. Van Natta* (1975), 61 Ill. 2d 483, 490:

" 'If what remains after the invalid portion is stricken is complete in itself and capable of being executed wholly independently of that which is rejected, the invalid portion does not render the entire section unconstitutional unless it can be said that the General Assembly would not have passed the statute with the invalid portion eliminated.' " (*People ex rel. Rudman v. Rini* (1976), 64 Ill. 2d 321.)

(See also *People v. Bradley* (1980), 79 Ill. 2d 410, 419; *Livingston v. Olgilvie* (1969), 43 Ill. 2d 9, 23; *Fiorito v. Jones* (1968), 39 Ill. 2d 531.) The remaining portion of the ordinance is complete in itself and susceptible to independent enforcement. Given the declared purpose of insuring "high standards of care and the maximum safety of the patient" (Code of Ordinances, ch. 10, art. IX, sec. 10—140) there is, it seems to us, no reason to believe it would not have been adopted even though its application was limited to centers primarily devoted to surgical procedures, including abortions.

With the invalid portion of the ordinance removed, much of the remaining portion of the ordinance becomes

"abortion neutral." That which is not, such as the provisions regulating the conditions under which obstetrical and gynecological procedures, including abortions, may be performed do not unduly burden the abortion decision. Additionally, the remainder of the ordinance does have a rational relationship to the protection of the health and welfare of patients. *Doe v. Bolton* (1973), 410 U.S. 179, 35 L. Ed. 2d 201, 93 S. Ct. 739, recognized that appropriately licensed institutions other than hospitals could adequately provide for the health of the patient desiring an abortion, thus implicitly acknowledging the licensing restriction as a reasonable regulation of the conditions under which an abortion may be performed. *Connecticut v. Menillo* (1975), 423 U.S. 9, 46 L. Ed. 2d 152, 96 S. Ct. 170, upheld restricting the performance of abortions to licensed physicians, and *Planned Parenthood v. Danforth* (1976), 428 U.S. 52, 49 L. Ed. 2d 788, 96 S. Ct. 2831, validated medical record keeping, confidential abortion reporting, and written, informed-consent requirements.

The 24-hour period required by the ordinance to elapse between the initial examination and terminaton of the pregnancy requires more detailed consideration. It provides:

> "Twenty-four hours shall be allowed between the initial examination and termination of pregnancy to permit the reporting to and reviewing of all laboratory tests with the patient by the facility physician." (Oak Lawn, Ill., Code of Ordinances, art. X, sec. 10−152(B)(1).)

While the Supreme Court has not addressed the question of governmentally prescribed delay of this nature, the lower Federal courts have generally ruled both 48-hour and 24-hour delays invalid under a strict-scrutiny standard as unduly burdening a woman's right to an abortion during the first trimester of pregnancy. Among the Federal courts of appeal the following action has occurred: In *Womens*

*Services v. Thone* (8th Cir. 1980), 636 F.2d 206, a 48-hour waiting period provided by the Nebraska abortion statute was held violative of due process under a strict-scrutiny standard. In *Wynn v. Carey* (7th Cir. 1979), 599 F.2d 193, a 48-hour waiting period required by the Illinois abortion act was held unconstitutional. *Charles v. Carey* (7th Cir. 1980), 627 F.2d 772, invalidated a 24-hour waiting period requirement of the Illinois abortion statute, stressing "delay attended by increased risk as the pregnancy progresses, especially for working women or women who must travel far, either arranging for overnight accommodations or making two trips." (627 F.2d 772, 785.) In *Wolfe v. Schroering* (6th Cir. 1976), 541 F.2d 523, the court upheld Kentucky's 24-hour waiting period, noting that it was not claimed that the delay significantly burdened the abortion process, and that an exemption was provided for emergency situations in which there was " 'imminent peril substantially endangering the life of the woman (541 F.2d 523, 526).' " *Friendship Medical Center, Ltd. v. Chicago Board of Health* (7th Cir. 1974), 505 F.2d 1141, one of the earlier cases, invalidated Chicago board of health regulations containing a 24-hour-waiting-period requirement. The court did not specifically address that issue but viewed the entire board action as impermissibly attempting to regulate first-trimester abortions. Two other courts of appeal, while not speaking to the question of delay, have invalidated entire regulatory plans. In *Nyberg v. City of Virginia* (8th Cir. 1974), 495 F.2d 1342, a municipal hospital resolution prohibiting nontherapeutic abortions was voided, and in *Word v. Poelker* (8th Cir. 1974), 495 F.2d 1349, a city ordinance regulating abortion clinics was struck down.

Two of the most recent court of appeals decisions reversed district court judgments upholding the validity of 24-hour waiting periods. (*Akron Center for Reproductive Health, Inc. v. City of Akron* (6th Cir. 1981), 651 F.2d

1198, *reversing* 479 F. Supp. 1172 (N.D. Ohio 1979); *Planned Parenthood League v. Bellotti* (1st Cir. 1981), 641 F.2d 1006, *reversing* 499 F. Supp. 215 (D. Mass. 1980).) Other district courts have invalidated both 48- or 24-hour periods in *Planned Parenthood Association of Kansas City, Missouri, Inc. v. Ashcroft* (W.D. Mo. 1980), 483 F. Supp. 679 (48 hours invalid), *Margaret S. v. Edwards* (E.D. La. 1980), 488 F. Supp. 181 (24 hours invalid), and *Women's Community Health Center, Inc. v. Cohen* (D. Me. 1979), 477 F. Supp. 542 (48 hours invalid).

The courts which have voided the 24-hour delay have emphasized the increased burden upon the woman, in that the inconvenience and additional expense of two trips or an overnight stay become necessary, the risk increases as the pregnancy progresses, and additional emotional stress occurs, results which were considered to outweigh the possibility that abusive medical practices would be eliminated in some instances. (*Akron Center for Reproductive Health, Inc. v. City of Akron*; *Charles v. Carey.*) Others have thought difficulties in scheduling the second visit to the doctor might prolong the delay to as much as three to five days and thus shift a first-trimester abortion into the second trimester (*Planned Parenthood League v. Bellotti*; *Margaret S. v. Edwards*), and the inflexibility of a uniformly mandatory delay has been criticized. *Planned Parenthood League v. Bellotti*; *Akron Center v. City of Akron.*

In the case before us no evidence was offered by defendant in support of his motion to dismiss, and our consideration is limited to the necessary consequences of the ordinance provisions. Among those is the necessity for the woman to visit the doctor on two occasions at least 24 hours apart. While we have no evidence as to increased physical hazard and emotional trauma, we may judicially notice that some additional expense in the form of overnight accommodations or a second trip is a necessary consequence of the 24-hour delay required by the ordinance.

For those of sharply limited means, any additional expense will be something of a burden. Too, the inflexibility of the ordinance is apparent in that it imposes the same delay upon both the informed and the uninformed. It is not beyond the reach of judicial notice that those seeking defendant's services would include both women referred by other physicians as well as those seeking an initial diagnosis. The former may have been advised and counseled by their family physicians in reaching a decision to seek an abortion. For them the additional testing and delay required by the ordinance may well serve a less valuable purpose than for the women who are not certain they are pregnant or are totally uninformed and seeking information regarding abortion possibilities. But there is, we believe, some benefit even to the former in the verification of pregnancy and the opportunity for further informed reflection and consideration of the variety of factors influencing a decision.

While we acknowledge there to be very real concerns in even a 24-hour delay and respect the judgment of those courts which have struck them down, it seems to us that there is a tendency to minimize the importance of the countervailing considerations. We are not convinced that the interest of the State in assuring that abortion decisions are made only on a voluntary, informed and considered basis is not a substantial and compelling one. A decision to abort or not to abort is of an extraordinary character and once executed, is irrevocable. It may have far reaching consequences. Because of its unique nature, we believe the State's interest in assuring the integrity of that decision is compelling. Despite the concerns earlier mentioned, we cannot conclude on the record before us that the 24-hour waiting period required by this ordinance imposes an impermissible burden upon a woman's abortion decision.

Other provisions of the ordinance calling for details of the ownership, design layout, personnel and organi-

zation plans, and policy procedures may add some administrative costs to health care provided by the centers. These basic operating standards are imposed, however, as reasonable requirements designed to achieve the State interest of insuring that such centers are managed and controlled under ethical and licensing requirements similar to those prevailing throughout the medical profession. We find nothing unreasonable in these provisions concerning minimum standards for health care of all patients, including the additional requirements for obstetrical and gynecological procedures, considering the State's interest in protecting the health and safety of all center patients.

> "The fact that an abortion clinic must conform to minimum health and safety standards would not in any way coerce a woman into not having an abortion; indeed, the opposite effect would probably result in that a woman would be assured that certain health and safety standards had been met. While the application of [the New York health service facilities statute] to abortion facilities may have the effect of increasing the cost of an abortion at such a facility, such an effect does not constitute undue interference with the abortion decision." (*Westchester Women's Health Organization, Inc. v. Whalen* (S.D.N.Y. 1979), 475 F. Supp. 734, 741.)

As the Supreme Court stated in *H. L. v. Matheson* (1981), 450 U.S. 398, 413, 67 L. Ed. 2d 388, 400, 101 S. Ct. 1164, 1173, upholding the Utah parental notice statute, "The Constitution does not compel a state to fine-tune its statutes so as to encourage or facilitate abortions."

Nor are we persuaded by defendant's argument that the ordinance is void for vagueness. The requirements it establishes are sufficiently definite to allow a person of ordinary sensibilities to understand what is required. *Rose v. Locke* (1975), 423 U.S. 48, 46 L. Ed. 2d 185,

96 S. Ct. 243; *People v. Schwartz* (1976), 64 Ill. 2d 275, *cert. denied* (1977), 429 U.S. 1098, 51 L. Ed. 2d 545, 97 S. Ct. 1116; *People v. Witzkowski* (1972), 53 Ill. 2d 216, *appeal dismissed for want of final judgment* (1973), 411 U.S. 961, 36 L. Ed. 2d 682, 93 S. Ct. 2162, *appeal dismissed for want of substantial Federal question* (1977), 434 U.S. 883, 54 L. Ed. 2d 169, 98 S. Ct. 253.

We accordingly reverse the judgment of the circuit court of Cook County and remand the cause for trial on the merits.

*Reversed and remanded.*

MR. JUSTICE SIMON, dissenting:

As the majority acknowleges, the overwhelming weight of authority invalidates waiting periods. In fact, the majority does not point to a single reviewing court, Federal or State, which accepts its position. Only one Federal circuit court opinion has ever sustained a waiting period (*Wolfe v. Schroering* (6th Cir. 1976), 541 F.2d 523), and it did so on the ground that no burden on the abortion decision was asserted. Since the same circuit later struck down a 24-hour waiting period (*Akron Center for Reproductive Health, Inc. v. City of Akron* (6th Cir. 1981), 651 F.2d 1198), the earlier result seems to prove only that it turned on a defect in pleading. The few Federal district court decisions upholding waiting periods have been reversed. The law on this subject can conservatively be described as well settled.

The majority does not pretend that the unanimous view of the Federal courts on this question is clearly or intolerably wrong, and concedes that the concerns motivating that view are "very real," and the decisions worthy of respect. Nor does this court base its disagreement on any fresh or improved idea, anything that might contribute to the discussion of the issue. The court simply leans upon a theory that has been squarely considered and rejected by

other courts. Resolving issues that were inherently difficult and therefore uncertain when they first arose is precisely what precedent is supposed to accomplish. The lower Federal courts' views are not binding on this court, but I believe they are entitled to more deference than the majority gives them. We are not confronting a question of first impression, and should not dispose of it as if we were. The majority seems to feel that when it comes to abortion, there is no law until the United States Supreme Court forces it upon us. The Supreme Court should not be obliged to spend its time putting the magic stamp of approval on well-understood law so as to make it formally binding on courts in other jurisdictions.

This court's departure from the settled Federal view of the matter is especially mischievous in view of the concurrent jurisdiction of the Illinois and Federal courts. The latter can enjoin enforcement of the Oak Lawn ordinance and similar laws. Indeed, because *Charles v. Carey* (7th Cir. 1980), 627 F.2d 772, is binding precedent in every Federal court in Illinois, any Federal court in this State (and probably also in the United States) would issue an injunction against the 24-hour waiting period upon application. The result of the majority's decision is that, for the indefinite future, cases will turn on which side gets to which courthouse first. That is not the kind of law the public can understand or respect. In our plural system of coexisting Federal and State jurisdictions, complete harmony between decisions of the parallel systems can be neither achieved nor expected. But that pluralistic system can be accommodated more prudently and wisely by striving for consistency between Federal and State decisions unless a strong reason for an opposite result is evident. In the interest of uniformity, the prudent thing for this court to do is to go along with the Federal courts, because there is no strong reason not to.

Apart from the force of precedent, I disagree with the

majority on the merits. They explain how the 24-hour waiting period creates a legally significant burden on the decision to abort, which the United States Supreme Court has held to be a fundamental right (*Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705), and correctly recite that it is therefore presumptively unconstitutional and can be upheld only if the village demonstrates that the waiting period is necessary to serve a compelling village interest. The majority justifies the waiting period by finding a compelling interest in assuring that the abortion decision is informed and considered. I do not find that justification compelling. In fact, I doubt it could survive even a test of reasonableness.

First, the ordinance itself tells us what the waiting period is for. It is not to give time for reflection, but for laboratory reports. The village, of course, has offered no evidence that 24 hours is needed for that purpose, and it seems unlikely, even if new lab reports are needed. Many patients will already have lab reports from their own doctors, and so will not need new ones. But the waiting period needlessly applies even to them. When the ordinance expressly states the purpose for the waiting period, I see no call for this court to invent others.

Second, even if the State interest the majority relies on is compelling, the 24-hour rule is not necessary for the purpose. "[O] ther courts have consistently found *** that virtually all women have given considerable thought to their decision to have an abortion long before they actually seek one." (*Planned Parenthood League v. Bellotti* (1st Cir. 1981), 641 F.2d 1006, 1015.) The village does not suggest that Dr. Marcowitz's patients are unusually impetuous.

Third, the majority's idea is that women should think more carefully about abortion than other surgery (for which the ordinance provides no waiting period) because the consequences are so serious and irrevocable. But are

they, medically? A woman who aborts one child can have another. Many types of surgery involve greater risk of complications. The waiting period cannot be justified on the basis of the village's interest in protecting health and safety, which is what the whole ordinance is supposedly about.

A decision to abort can no doubt have long-term personal and social consequences. But it is not obvious, and the village has not shown, that a vasectomy or sterilization or many other surgical procedures, for which no waiting period is required by the ordinance, do not also have serious and irrevocable consequences.

The real difference with abortion—what is serious and irrevocable—is the moral aspect. The waiting period gives women time to think again before deciding to go through with an abortion, because abortion, while a fundamental constitutional right, may be a moral wrong. But neither the village nor this court is willing to espouse this justification for the waiting period openly, and, in any event, I do not believe it would be constitutionally sufficient. It is too much like a straightforward attempt to discourage abortion; it cuts too far into the basic constitutional decision that abortion is permissible. Could a State require a waiting period before one exercises other fundamental rights the morality of which some might question, such as publishing a scurrilous newspaper, buying contraceptives, or attending a lewd movie? Obviously not, and I therefore do not see how the waiting period for abortion can be constitutionally justified by the importance or nature of the decision.

I conclude that the waiting period is unconstitutional. I have problems with some other sections of the ordinance as well. For example, Dr. Marcowitz must pay a fee of $5,000 initially and $2,000 annually; the size of the initial fee in relation to the annual fee appears suspect. Then, the requirement for hospital staff membership may preclude

abortion clinics if no nearby hospital will grant staff privileges to a physician who performs abortions. But there is little point in elaborating. If one views the ordinance as a whole, including the peculiar definition which the court has correctly stricken down, the laboratory tests required for abortion and nothing else, and the waiting period required for abortion and nothing else, even though the patient may already have all laboratory tests, the ordinance "comes into focus" (*Planned Parenthood v. Danforth* (1976), 428 U.S. 52, 79, 49 L. Ed. 2d 788, 810, 96 S. Ct. 2831, 2845) as unmistakably anti-abortion, and therefore invalid. I would affirm the circuit court.