(No. 55457.—)

COMMERCIAL NATIONAL BANK OF CHICAGO *et al.*, Appellants, v. THE CITY OF CHICAGO *et al.*, Appellees.

*Announced November 16, 1981.—Opinion filed*
*January 25, 1982.*

46

UNDERWOOD, GOLDENHERSH, and CLARK, JJ., concurring in part and dissenting in part.

Don S. Harnack, Wilber H. Boies, Richard A. Hanson, and John E. Gaggini, of Chicago (McDermott, Will & Emery, and Carleen S. Davis and Gregory Palmer, law students, of counsel), for appellants Commercial National Bank *et al.*

John F. McCarthy, of McCarthy & Levin, and Richard J. Phelan, of Phelan, Pope & John, Ltd., of Chicago (Robert T. Fasic; Malcolm S. Kamin, of Arvey, Hodes, Costello & Burman; Roseann Oliver, of Phelan, Pope & John, Ltd.; John J. Jiganti, of Harris, Burman, Sinars & Jiganti; and Lawrence S. Wick, of Leydig, Voit, Osann, Mayer & Holt, Ltd., of counsel), for appellants Chicago Bar Association *et al.*

Henry L. Pitts, Alan S. Ganz, and Marc A. Primack, of Rooks, Pitts, Fullagar & Poust, of Chicago (Howard H. Braverman, of Springfield, of counsel), for appellants Illinois State Bar Association, John J. Cassidy, Jr., and Thomas S. Johnson.

Stanley Garber, Corporation Counsel, of Chicago (Daniel Pascale, Robert R. Retke, Philip L. Bronstein, and Jerome A. Siegan, of counsel), for appellees.

Concannon, Dillon, Snook & Morton, of Chicago (William R. Dillon, John B. Dillon, and Barry C. Kessler,

of counsel), for *amicus curiae* Corporate Fiduciaries Association of Illinois.

Clifford L. Weaver and Susan B. Harmon, of Ross, Hardies, O'Keefe, Babcock & Parsons, of Chicago, for *amicus curiae* Chicago Association of Commerce and Industry.

Melvin A. Brandt, of Chicago, for *amicus curiae* Illinois Small Businessmen's Association.

CHIEF JUSTICE RYAN delivered the opinion of the court:

The Chicago service-tax ordinance was adopted on July 20, 1981. (Municipal Code of Chicago § 200.5—1, *et seq.* (1981).) These consolidated appeals involve several challenges to the constitutionality of the ordinance. Separate suits were originally filed in the circuit court of Cook County by (1) the Commercial National Bank of Chicago and various business entities; (2) the Illinois State Bar Association, representing attorneys throughout the State of Illinois; and (3) the Chicago Bar Association, its officials and certain members, and various other professional societies and members. Defendants in one or more of the suits are the city of Chicago and officials of the city. In addition, the Corporate Fiduciaries Association of Illinois, the Chicago Association of Commerce and Industry, and the Illinois Small Businessmen's Association subsequently filed *amicus* briefs.

Plaintiffs, prior to filing the circuit court actions, had sought leave to file similar complaints as original actions in this court pursuant to our Rule 381(a) (81 Ill. 2d R. 381(a)). We denied leave, but directed that, in the event the suits were filed in the circuit court of Cook County, the court hear the cases expeditiously with a view toward their disposition prior to August 31, 1981. Plaintiffs thereafter proceeded in the circuit court, seeking a declaratory judg-

ment holding the service-tax ordinance invalid, and injunctive relief. The cases were consolidated, and the circuit court granted plaintiffs' motion for a preliminary injunction enjoining defendants from enforcing the penalty provisions of the ordinance and requiring defendants to retain in escrow any amounts collected pending a final determination of the constitutionality of the tax. Defendants appealed to the appellate court from the preliminary injunction, and we allowed their motion to transfer that appeal directly here, taking the matter under advisement and denying the motion to vacate or stay the preliminary injunction. Defendants thereafter moved in the circuit court to dismiss the complaint for failure to state a cause of action. After consideration of extensive memoranda and oral arguments, the court, in a comprehensive opinion, granted the motion to dismiss, holding that the ordinance was not unconstitutional either in whole or in part for any of the reasons alleged in the complaints and dissolving its preliminary injunction.

The plaintiffs appealed to the appellate court and we again granted their motion to transfer the appeal to this court pursuant to our Rule 302(b) (73 Ill. 2d R. 302(b)), and reinstated the injunction. To avoid unnecessarily complicating the city's fiscal planning, and to accommodate the city and the litigants, we departed from our customary procedure and on November 16, 1981, issued a brief decision declaring the Chicago service-tax ordinance to be unconstitutional, with a written opinion to follow. In this opinion we set forth the reasons for that decision. A majority of the court, as one basis for the decision, finds that the service-tax ordinance adopted by the city of Chicago is unconstitutional as an attempt to impose a tax upon occupations without authorization by the General Assembly, contrary to article VII, section 6(e), of the 1970 Illinois Constitution.

Under the 1870 Constitution, Illinois municipalities had only those powers which the State, through the General

Assembly, conferred. (7 Record of Proceedings, Sixth Illinois Constitutional Convention 2727 (hereinafter cited as Proceedings).) After the adoption of the 1970 Constitution, which created home rule units of local government in this State, any county which has an elected chief executive officer, any municipality which has a population of more than 25,000, and any other municipality which elects to become a home rule unit by referendum may exercise home rule powers as provided in the Constitution. (Ill. Const. 1970, art. VII, § 6(a).) The Constitution defines the powers of home rule units as follows:

"*Except as limited by this Section,* a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; *to tax;* and to incur debt." (Emphasis added.) (Ill. Const. 1970, art. VII, § 6(a).)

Thus, any limitation on the power of a home rule unit to tax must be found within section 6 of article VII of the Constitution. We find such a limitation in section 6(e) of that article, which provides:

"A home rule unit shall have *only* the power *that the General Assembly may provide* by law (1) to punish by imprisonment for more than six months or (2) to license for revenue or *impose taxes upon or measured by income or earnings or upon occupations.*" (Emphasis added.) (Ill. Const. 1970, art. VII, § 6(e).)

The effect of this constitutional limitation is to place home rule units in the same position with respect to licensing for revenue and imposing taxes upon or measured by income or earnings or upon occupations that all units of local government were in prior to 1970. That is, home rule units have only the power in these methods of raising revenue conferred by the General Assembly. The power to raise revenue in the enumerated methods stems not from home rule powers but from legislative grant of authority. (7

Proceedings 1670.) For home rule units generally, the role of the General Assembly was significantly narrowed by the Constitution; however, the intent of this section of the Constitution is that the legislature exercise "maximum supervisory power" in these enumerated areas. 7 Proceedings 1672.

The Chicago service-tax ordinance was adopted by the city council pursuant to its home rule powers conferred by the 1970 Constitution (Ill. Const. 1970, art. VII, §6(a)). It imposes a tax on "each purchaser who purchases service in the City after July 31, 1981, at the rate of 1% of the purchase price of such service." (Municipal Code of Chicago, §200.5—3 (1981).) The tax is expressly imposed on the purchaser, but collection and remittance duties are placed on the seller, who is also liable for uncollected taxes.

The service-tax ordinance is challenged, *inter alia,* on the ground that it is a tax "upon occupations" enacted without legislative authorization in contravention of the 1970 Constitution. Since the adoption of the 1970 Constitution, this court has had several occasions to rule on similar challenges to various taxing ordinances enacted by home rule units. In those cases, which will be discussed later, it was noted that section 6(m) of article VII of the Constitution requires that the powers and functions of home rule units shall be liberally construed. In those cases, in upholding taxing ordinances, this court "liberally construed" the powers of home rule units to enact taxing ordinances under the 1970 Constitution. We are urged to do so once again and to uphold the Chicago service-tax ordinance. We cannot uphold the ordinance without violating the clear limitation of article VII, section 6(e), of the Constitution, which requires authorization by the General Assembly before a home rule unit can impose a tax upon occupations.

In the instant case, the tax which the city of Chicago seeks to impose falls within the area of taxation the delegates to the sixth constitutional convention intended to limit

by denying home rule units the power to "license for revenue or impose taxes upon or measured by income or earnings or upon occupations," unless authorized by the General Assembly (Ill. Const. 1970, art. VII, §6(e)). This restriction now found in section 6(e) was presented to the convention in paragraph 4.4 of the proposal of the majority of the Committee on Local Government of the constitutional convention. The explanation of this restriction on the authority of a home rule unit to impose taxes upon occupations is contained in the report of that committee, which states:

"It should be noted that paragraph 4.4 requires legislative authorization for taxes based *upon an occupation as well as those based upon or measured by income or earnings.* *** [T]he inclusion of occupational taxes in this paragraph is *meant to prevent the evasion of its terms by calling a tax an occupation tax instead of an income or earnings tax.* In addition, the reference to occupation taxes will prevent the *proliferation of various* business and *occupation taxes at the local level.* Such taxes will be valid only if authorized by the General Assembly. This exception to home-rule taxing powers is justified on the ground that a large number of various and varying occupation taxes could impair the efficient operations of business within the state." (Emphasis added.) (7 Proceedings 1673.)

Thus, the majority of the committee felt that the limitation on a home rule unit's authority to tax occupations was necessary to (1) prevent an evasion of the limitation on home rule units' authority to impose a tax measured by income or earnings, and (2) to prevent a proliferation of taxes on various businesses and occupations at local levels which could impair the efficient operation of business within the State, believing that, by vesting the authority to authorize such taxes in the General Assembly, these consequences should be controlled on a State-wide basis.

Although it is true that the remarks of an individual

delegate may or may not reflect the general sentiment of the constitutional convention, it is, nevertheless, quite clear from the debates that it was the consensus of the convention that taxes upon occupations should not be imposed by home rule units unless legislatively authorized and that this limitation was specifically considered in relation to the imposition of taxes on services. It is also apparent that the delegates were aware of various means that had been used in other jurisdictions to evade particular restrictions on the taxing power by imposing a similar tax under the guise of a different name. The debates reflect that the delegates were intent on preventing a similar evasion of the restrictions of paragraph 4.4 of the report.

The delegates considered this particular constitutional provision at length, and there was strong feeling expressed in the convention against permitting home rule units to impose an income tax without legislative authorization. It was pointed out that paragraph 4.4 of the report would not simply prohibit home rule units from imposing an income tax. The language of that paragraph was much broader and prohibited taxes "upon or measured by income [or] earnings" so as to prevent circumventing the restriction on income taxes. (4 Proceedings 3159; 7 Proceedings 1669-70.) As noted in the majority report quoted above, one of the reasons for the restriction on occupation taxes was to prevent the use of that type of a tax to circumvent the income tax restriction. Several delegates expressed the opinion that a tax on occupations measured by earnings, in their opinion, constituted an income tax or a tax measured by earnings. 4 Proceedings 3165-69.

On three separate occasions during the consideration of paragraph 4.4 of the report, an amendment was proposed that would have eliminated the occupation-tax restriction, and on each occasion the amendment was defeated. (4 Proceedings 3157-71, 3369-71; 5 Proceedings 4167-69.) Delegate Meek initially proposed to amend paragraph 4.4 by

deleting the words "or" and "occupation." (4 Proceedings 3157.) He spoke at length concerning this amendment and stated that he wanted cities to be able to tax occupations without the necessity of having legislative approval. (4 Proceedings 3159.) He further stated:

"As far as I am concerned, what I did envision in all honesty was a tax on the occupation measured exactly on the tax that the retailer pays at the present time.

Mr. Elward: Well that is gross receipts, is it, which—

Mr. Meek: Yes, it is." 4 Proceedings 3163.

Those who spoke in favor of the Meek Amendment to permit taxes on occupations spoke in terms of occupation taxes primarily on those in occupations which provided services. (4 Proceedings 3159, 3160-61.) Delegate Mullen, speaking in favor of the Meek Amendment, stated:

"*** I look on the word 'occupation' as a corollary to the sales tax, and some of the people in some of the tax studies have suggested that a logical extension of the sales tax could be to [tax] professional or commercial services. ***.

These are, I think, *** an extension—a logical extension—of the sales tax, not only to the sale of tangible personal property, but to the component of service as well ***.

*** [I]f we give our home rule entities free power on the sales tax, it seems to me a logical extension to carry it to these kinds of services, which I, as I said before, look on as a corollary.

\* \* \*

*** [F]rankly I would prefer an extension of the income tax over these other occupation taxes or whatever you wish to call them—service taxes." (4 Proceedings 3160-61.)

Thus, Delegate Mullen saw the occupation tax as a "corollary" to the sales tax which would extend that tax to services, and in the last paragraph quoted above, equated

the occupation tax with a tax on services.

The opponents of the amendment, who favored the restriction on the occupation tax, noted that paragraph 4.4 of the report did not affect a home rule unit's authority to levy a sales tax, that is, a tax on the sale of tangible personal property. The delegates held the view that the sales tax was an excise tax, the accepted definition of which at the convention was "an indirect tax on production, sale, or distribution," and that tax was not limited by the restriction of paragraph 4.4 of the report. (4 Proceedings 3166.) Although, as Delegate Mullen acknowledged in the above quotation, some authors advocated the extension of the sales tax to cover services, the sales tax, as an excise tax, which a home rule unit could impose, was not considered by the delegates to encompass a tax on services. Therefore, Delegate Mullen considered that a home rule unit must also have the authority to tax occupations as a "corollary" to the sales tax.

This conclusion finds further support in an exchange between Delegate Mullen and Delegate Parkhurst, who was chairman of the Committee on Local Government. Delegate Mullen asked Chairman Parkhurst:

"I am talking about the extension of the sales tax—the state sales tax, for instance—to services—repair services, professional services, commercial services * * * [Y]ou are prohibiting here the occupation tax. Does this mean the kind of professional and commercial services that might be an extension of the sales tax? * * *." (4 Proceedings 3153-54.)

Chairman Parkhurst answered:

"* * * I think that extension of a sales tax in a municipality to occupations which provide services— not those which sell tangible personal property at retail—

Mrs. Mullen: Right.

Mr. Parkhurst: —but which sell services would be precluded under the provisions of section 4.4 unless

authorized by the General Assembly, because *I don't see how you could possibly interpret a tax on those services as anything else than a tax on an occupation.* (Emphasis added.) (4 Proceedings 3153-54.)

Again distinguishing between the sales tax on the retail sale of tangible personal property and the occupation tax, Delegate Parkhurst observed:

"I think that either a sales or use tax could be imposed by a municipality with home rule clearly, and I think that *under 4.4 a tax on an occupation based upon its sales would not be possible unless authorized by the General Assembly.* (Emphasis added.) (4 Proceedings 3154.)

Different versions of the Meek Amendment attempting to delete the restriction on occupation taxes were, as earlier stated, offered and defeated three times. Thus, the delegates' determination to allow taxes upon occupations only with legislative authorization was clear.

In addition to the three proposals to delete the restriction on occupation taxes from paragraph 4.4, the delegates also considered proposals for a variety of other modifications of the restriction, all of which were defeated. 4 Proceedings 3172-73, 3175, 3179, 3185-87.

One of the three amendments to paragraph 4.4 suggested by Delegate Meek would have specifically authorized units of local government to levy taxes upon occupations and service taxes and use taxes unless preempted by the State. (4 Proceedings 3365.) The proponents of this amendment urged its adoption so that those who provided services would be taxed the same as retailers; that is, services should be taxed to the same extent as sales. (4 Proceedings 3365-68.) The amendment was soundly defeated. (4 Proceedings 3371.) The convention's action on this Meek Amendment fairly well summarizes the lengthy controversy in the convention concerning a home rule unit's authority to levy taxes on occupations. The convention firmly rejected the idea of permitting home rule units to

impose taxes on occupations without legislative authority, and it firmly rejected the idea that a home rule unit should be able to impose occupation taxes as a means of taxing services complementing the sales tax on tangible personal property.

The trial court, in upholding the Chicago service tax in this case, noted that historically in Illinois, there have been several unsuccessful attempts to expand the tax on retail sales of tangible personal property to include services. Report of the Commission on Revenue 26-27 (1963); 2 Journal of the Senate, 75th Gen. Ass'y 2729-30 (1967); Report of Governor's Revenue Study Committee 1968-69, at 13.

In debating the various attempts to amend paragraph 4.4 of the report, the delegates did not draw a distinction between a service tax that may be imposed upon the purchaser of services and one in which the tax is placed upon the provider or seller of the services. It was recognized that under a home rule unit's power to tax, taxes could be placed upon sales of tangible personal property and the restrictions of paragraph 4.4 of the report would not affect a taxing power of that nature. However, it is clear from the debates that the restrictions of paragraph 4.4 of the report were intended to prevent, without legislative approval, a tax on services by home rule units similar to the tax on the sale of tangible personal property. Paragraph 4.4 of the majority report, with minor modifications, became section 6(e)(2) of article VII of our constitution.

The discussion thus far in this opinion supports the following summation. Prior to the constitutional convention of 1970, the concept of a sales tax in this State was a tax on the sale of tangible personal property. As indicated in the constitutional debates, that was the context in which the term "sales tax" was used and considered by the delegates. The debates reveal that sales taxes fall within the definition of "excise taxes" as used in the convention and that such

taxes were within the grant of the power "to tax" conferred upon home rule units by section 6(a) of article VII of the Constitution. It was further felt by the delegates that the limitation on the power to tax now contained in section 6(e) of that article does not affect or limit the power of a home rule unit to impose such taxes.

As illustrative of this understanding, the report of the Local Government Committee of the Convention, in explaining the extent of the powers of home rule units, set forth several examples. The report states that under its home rule powers, a city may impose a tax at a fixed rate per gallon on gasoline and that local taxes upon hotel rooms, liquor, food, drugs, etc., are permissible. The examples also state that a home rule unit may enact a sales tax concurrent with a State sales tax under its power to tax unless action by the State is declared to be exclusive. 7 Proceedings 1655-56.

In light of this summation, it is appropriate to discuss and distinguish the earlier cases in which this court has upheld taxes imposed by home rule units. In those cases, the taxing power was liberally construed, and the tax was found not to fall within the restrictions of section 6(e) of article VII. The taxes considered in those cases, however, are different in kind from the Chicago service tax. The taxes in those cases fall within the area of taxation which the debates and the examples cited above show were understood by the convention to be encompassed within the power "to tax." Various names or terms have been applied to different methods of taxation, and they are not always consistently used. For instance, the term "excise tax" does not always convey a precise or the same meaning. Similarly, the term "sales tax," in some instances, has been used to cover sales of services, as well as sales of tangible personal property. However, from the constitutional debates, a sense can be gathered of the meaning given to these terms by the convention, the general nature and extent of the taxing authority conferred upon home rule units, and the areas

wherein it was intended that the taxing authority of home rule units be limited or restricted. Our previous holdings are consistent with the intent of the delegates and with our holding in this case that the Chicago service-tax constitutes a tax upon occupations.

In S. *Bloom, Inc. v. Korshak* (1972), 52 Ill. 2d 56, a tax imposed upon the sale of cigarettes was upheld against the challenge that it was an occupation tax which could not be levied without a grant of authority from the General Assembly as required by section 6(e) of article VII of the Constitution. In *Mulligan v. Dunne* (1975), 61 Ill. 2d 544, a tax of a fixed amount per gallon on the retail sale of alcoholic beverages was upheld against the contention that it was an occupation tax. In *Town of Cicero v. Fox Valley Trotting Club, Inc.* (1976), 65 Ill. 2d 10, an ordinance was upheld which imposed a flat-rate tax of 10 cents for each person witnessing, participating in, or attending a place of entertainment. It was contended that this constituted an occupation tax. In *Kerasotes Rialto Theater Corp. v. City of Peoria* (1979), 77 Ill. 2d 491, a tax of 2% of the price of admission to amusements was held not to be a tax upon occupations. In *Jacobs v. City of Chicago* (1973), 53 Ill. 2d 421, a tax was imposed upon the use and privilege of parking a motor vehicle upon or in a parking lot or garage. The tax was challenged as an attempt to license for revenue, which was beyond the taxing authority of home rule units under section 6(e) of article VII, unless authorized by the General Assembly. This court upheld the tax. Here, as in the other cases, the tax was clearly within the scope of the examples set out in the majority committee report. There is no distinction between the tax on a hotel room noted in the examples given and a tax on the use of a parking place for a vehicle.

In *Paper Supply Co. v. City of Chicago* (1974), 57 Ill. 2d 553, a tax of $3 per month upon every employer of more than 15 employees was alleged to be a tax upon an

occupation. This court held that the levy was not a tax "upon occupations" but a tax upon the privilege of employing 15 or more employees. The status of employer had not been recognized in this State as constituting an occupation, at least not in the area of taxation. Also, it was noted in *Paper Supply* that previous holdings of this court had defined "occupation tax" in such a manner as not to include employers. The dissent in *Paper Supply* did not quarrel with the past holdings of this court as to the meaning of "occupation tax" but contended that the tax imposed on the employer was revealed by the debates of the constitutional convention to be within the contemplation of a tax "upon occupations" as considered by the constitutional convention and therefore was limited by section 6(e) of article VII.

Even if the Chicago service tax can be said to be a tax upon those who provide or sell services, we must consider whether such a tax is a "tax upon occupations" as that term is used in section 6(e)(2) of article VII. The court in *Paper Supply* held that an occupation tax must be a tax upon a *given* occupation, basing its holding on *Reif v. Barrett* (1933), 355 Ill. 104. The statement in *Paper Supply* that an occupation tax is a tax upon a *given* occupation must be read in the context of that case. That statement does not mean that an occupation tax can only be a tax upon specific trades, businesses or professions, such as salesmen, barbers, lawyers, or grocers. The term "occupation tax" may indeed be so applied, but it also may be used in a broader sense. In fact, in *Reif* this court upheld this State's retailers' occupation tax as a tax upon the privilege to *engage in the business of selling tangible personal property to purchasers for use or consumption*. (*Reif v. Barrett* (1933), 355 Ill. 104, 117.) The tax was not upon a *given* occupation as that term may be narrowly used. In holding that the retailers' occupation tax was an occupation tax, the court was referring to the broader use of the words "*given* occupation."

The fact that this court in *Paper Supply* held that the

status of employer was not an "occupation," as that term had previously been understood in relation to taxation, has no bearing on whether those who provide services may be considered to be engaged in an occupation for purposes of taxation. Historically, in this State those who provide services, as well as retail merchants, have been considered as being subject to an occupation tax. In *Hagerty v. General Motors Corp.* (1974), 59 Ill. 2d 52, this court referred to the Service Occupation Tax Act (Ill. Rev. Stat. 1965, ch. 120, par. 439.101 *et seq.*) and the Service Use Tax Act (Ill. Rev. Stat. 1965, ch. 120, par. 439.31 *et seq.*) as being parts of this State's complex tax structure designed to protect the "basic sales tax" (the Retailers' Occupation Tax Act) (Ill. Rev. Stat. 1965, ch. 120, par. 440 *et seq.*) from erosion.

Prior to 1967, the Service Occupation Tax Act imposed a tax upon all persons engaged in the business of making sales of services. The tax was measured by a percentage of the cost price of tangible personal property transferred as an incident to a sale of services. In 1967 the Act was amended and the tax was no longer measured by the cost of the tangible personal property transferred but by the gross receipts from the sale of services. However, the tax applied only to four enumerated categories of servicemen. (Ill. Rev. Stat. 1967, ch. 120, par. 439.102.) In *Fiorito v. Jones* (1968), 39 Ill. 2d 531, this court held the 1967 amendment unconstitutional because of the classification of those subject to the tax. In 1968 the Act was amended, again measuring the tax by the cost of personal property transferred incident to the sale of services. (Ill. Rev. Stat. 1969, ch. 120, par. 439.103.) The Service Occupation Tax Act is in effect today. The tax is imposed upon "all persons engaged in the business of making sales of services" and is measured by the cost of the tangible personal property transferred as an incident to a sale of services. (Ill. Rev. Stat. 1979, ch. 120, par. 439.103.) Municipalities are also authorized by statute to levy a service occupation tax measured by a percentage of the cost

of tangible personal property transferred incident to a sale of services. (Ill. Rev. Stat. 1979, ch. 24, par. 8—11—5.) Thus, those who provide or sell services have been recognized in this State as being engaged in an occupation subject to taxation the same as retailers. The fact that this court, in *Paper Supply,* held that an occupation tax is a tax on a *given* occupation does not mean that those who sell services cannot be classified as being engaged in an occupation subject to an occupation tax because they have been and are now so classified.

Following the holding in *Reif,* it is illogical to say that the tax we are now considering is not an occupation tax because it is not imposed upon a *given* occupation, such as upon lawyers, doctors, or barbers. The word "occupation" in this case must be considered in the broader context as in *Reif,* and the tax must be judged by the standard of whether it is one imposed upon the privilege of engaging *in the business of selling services,* that is, in service occupations.

So far in this opinion we, as was the case with the delegates to the constitutional convention, have not drawn the fine line of distinction between a tax imposed upon the seller of services and one imposed upon the purchaser of these services. Those who opposed the restriction on the power to tax occupations in the constitutional convention saw this limitation as an impediment to taxing the sale of services, regardless of whether such a tax could technically be considered an occupation tax or a sales tax. One delegate asked why a woman who could not afford to go to a beauty parlor should be forced to pay a sales tax on home beauty aids, which she would administer herself, while a more affluent woman would not have to pay a tax on similar services rendered at a beauty parlor. (4 Proceedings 3366.) The proposals to eliminate this restriction on the authority to levy taxes on occupations were consistently defeated.

This court, in the cases which have upheld home rule taxes against the contention that they were taxes imposed

upon occupations, noted that the legal incidence of the taxes was not upon the seller but was placed by the ordinance upon the purchaser. Significance was attached to such provisions in those cases as indicating that the taxes were not occupation taxes but taxes upon the consumer. In those cases the tax was upon the transfer of a tangible object (cigarettes, alcoholic beverages), the privilege of occupying a parking place, the privilege of attending an amusement, and the privilege of employing employees. We have noted above that those taxes were taxes which the constitutional convention perceived to be within the power of home rule units to impose, and were considered as not being limited by the restrictions of section 6(e) of article VII.

Although most of the discussion in the constitutional convention concerning taxes upon occupations related to taxing services, it is not indicated in the debates that the limitation in section 6(e) of article VII should not apply to taxes upon occupations other than those which provide services. Thus, although the debates disclosed that a pure sales tax on tangible personal property is authorized under section 6(a) of article VII, a tax upon the occupation or upon one who sells the personal property would, nonetheless, fall within the restriction of section 6(e)(2). The same would be true of any other tax which the delegates considered to be permissible under section 6(a). For example, in *Estate of Carey v. Village of Stickney* (1980), 81 Ill. 2d 406, a tax of 10 cents for each person entering the grounds of a racetrack licensee upon a ticket of admission was held to be a tax upon an occupation and within the restrictions of section 6(e) because this court found that the tax was specifically imposed upon the licensee and was not imposed upon the purchaser of the ticket.

In previous cases where this court upheld the taxation against a challenge that it was an occupation tax, the ordinances imposed certain obligations and burdens upon the seller. However, in *Bloom, Mulligan,* and *Kerasotes*

each ordinance provided that the legal incidence of the tax was upon the purchaser, that is, that it would not shift from the purchaser to the seller by virtue of these burdens and obligations. Thus, the declaration of legislative intent in *Bloom, Mulligan,* and *Kerasotes* that the legal incidence of the tax was upon the purchaser was consistent with the general nature of the tax which the delegates found to be authorized by the general taxing power conferred by section 6(a) unrestricted by the provisions of section 6(e).

In analyzing the effect of the declaration by the city council that the Chicago service tax is imposed upon the purchaser, that is, that the legal incidence of the tax is upon the consumer, we must start from the premise that we are here dealing with the type of a tax—a tax on the sale of services—that the constitutional convention intended to come within the limitation of section 6(e) of article VII. The declaration that the tax in our case is on the purchaser is therefore not consistent with the constitutional restriction on taxes upon occupations but is an attempt to erode, diminish or evade the intent expressed in the constitutional convention.

The trial court, in upholding the Chicago service tax, stated that the ordinance adopting that tax and the ordinance adopting the Chicago sales tax were adopted by the city council on the same day and that it was the intention of the city council to impose the broadest possible consumer sales tax. The court noted that the two ordinances were intended to work "in-tandem" to tax both services and sales. This attempt to so broaden the sales tax is precisely that which section 6(e)(2) of article VII was intended to limit.

It is important to again consider the response of the chairman of the Committee on Local Government to a query during the constitutional debates.

"I think that an extension of a sales tax in a municipality to occupations which provide services—not those which sell tangible personal property at retail ***—

but which sell services would be precluded under the provisions of section 4.4 [section 6(e)(2) of article VII] unless authorized by the General Assembly, because I don't see how you could possibly interpret a tax on those services as anything else than a tax on an occupation." (4 Proceedings 3154.)

Therefore, in this case we are not dealing with the kind of a tax that the constitutional convention saw as coming within the unrestricted authority of a home rule unit. We must, therefore, consider whether a simple declaration that a tax is imposed upon purchasers of services, that is, that the legal incidence of the tax is upon the purchaser, is sufficient to avoid the restrictions imposed by the Constitution.

The court noted in *Reif* that "[t]he type of tax is not changed by any name that may be given it under the law through which it is enacted * * *." (*Reif v. Barrett* (1933), 355 Ill. 104, 109-10.) In *Winter v. Barrett* (1933), 352 Ill. 441, 459, this court, in construing certain exemptions in an act imposing a tax upon persons engaged in the business of selling tangible personal property at retail, stated that the legislature has no power to declare that not to be a fact which everyone knows is a fact. (See also *Johnson v. Daley* (1949), 403 Ill. 338, 342; *Ohio Oil Co. v. Wright* (1944), 386 Ill. 206, 216.) It is the practical operation and effect of the statute that determines where the legal incidence of the tax falls and the nature of the tax. (*Gurley v. Rhoden* (1975), 421 U.S. 200, 209, 44 L. Ed. 2d 110, 118, 95 S. Ct. 1605, 1611.) Therefore, the practical operation of the entire ordinance, not just the simple declaration that the tax is on the purchaser, must be judged against the intent expressed by the delegates in the constitutional convention in determining whether the tax imposed by the ordinance falls within the proscription of section 6(e) of article VII.

The city of Chicago, in enacting the service-tax ordinance, has copied verbatim substantially all of the Illinois Retailers' Occupation Tax Act (Ill. Rev. Stat. 1979, ch. 120,

par. 440 *et seq.*). Thus, by a few insertions, the city has attempted to convert an occupation tax into a tax upon consumers. All of the obligations of the retailer in the Retailers' Occupation Tax Act are imposed upon the seller of services by the Chicago service-tax ordinance. The principal difference between the Retailers' Occupation Tax Act and the Chicago service-tax ordinance is found in the provision of the ordinance contained in section 200.5—3:

> "[A] tax is imposed upon each purchaser who purchases service in the City ***. The tax imposed hereunder and the obligation to pay the same is upon the purchaser. The tax shall be collected from the purchaser by the seller and remitted to the City as provided herein. *** The failure of the seller to collect the tax shall not excuse or release the purchaser from this obligation to pay the tax."

Also, the ordinance provides in section 200.5—7 that the finance officer of the city of Chicago may sue the purchaser to recover unpaid taxes. However, the ordinance also provides that the seller of sevices may be sued to recover any unpaid taxes.

The distinction between a sales tax (the tax on the consumer) and an occupation tax is not always clearly reflected in the act or the ordinance and is not always easy to ascertain. In the case of a sales tax, it is presumed that the tax will be shifted forward to the consumer, the business firm being regarded as a tax-collecting agent. However, a business occupation gross receipts tax is measured by substantially the same standards as is a sales tax, and the tax on the business occupation is likewise usually shifted forward to the consumer. The difference between the two taxes is primarily one of legislative intent. (J. Due, Sales Taxation 4 (1957); J. Due, State and Local Sales Taxation 2 & n.1 (1971).) In our case there is essentially no difference between the service tax and an occupation tax measured by gross receipts. All of the legal obligations imposed upon a

seller by an occupation tax are imposed upon the seller of services by the Chicago ordinance. All of the legal obligations imposed upon the purchaser of services by the ordinance are also imposed upon the seller of services.

The reasons given in the majority report of the Committee on Local Government of the constitutional convention for restricting a home rule unit's authority to impose a tax upon occupations are just as applicable to the Chicago service tax. The mere recitation in the ordinance that the tax is upon purchasers of services does not eliminate the evils the delegates to the convention sought to prevent.

Obviously, the city of Chicago was aware of the "legal incidence" language previously used by this court and attempted to tailor its ordinance to incorporate a sufficient amount of such language—"magic words"—to transform an occupation tax into a tax upon the purchaser.

We can appreciate that some home rule units, as well as other units of local government, may have financial problems. The constitutional debates reveal that the delegates were well aware that adequate financial resources must be made available to home rule units. In spite of this recognition, the convention adopted the limitations of section 6(e)(2) of article VII.

Although broad home rule powers were conferred by the Constitution, the convention did not intend to extend to home rule units complete autonomy. It was thought that the limited number of restrictions on the taxing power provided in section 6(e) of article VII were necessary. In the introduction to the 1970 Illlinois Constitution by Samuel W. Witwer, the president of the constitutional convention, it is stated:

"Nearly a century of experience provided one clear and simple conclusion—that a new constitution was needed desperately. The old one was too rigid and detailed. The state was forced increasingly to seek ways around its unworkable Constitution which became a system of evasions, circumventions and at

times downright violations of clear mandates of the basic law." (1 Proceedings ix.)

At this time, no more than 10 years after the effective date of our new constitution, the justification, if any, for the avoidance of the outmoded limitations of the 1870 Constitution is no longer viable, and there is no reason to nullify the carefully tailored home rule concept of the 1970 Constitution.

Obviously, the delegates to the convention, by inserting into the Constitution the restriction on imposing taxes upon occupations, intended that the restriction limit the taxing power of home rule units. The lengthy discussion in this opinion of the debates indicates that this limitation was especially designed to apply to the area of taxation covered by the Chicago ordinance—taxes on services. We cannot close our eyes to, nor can we ignore, that which is clearly the intent of the delegates to the convention. Some meaning must be given to the restriction of section 6(e)(2) of article VII. If we permit this restriction to be nullified by simply inserting a few words in an ordinance, which ostensibly impose the legal incidence of a tax upon the purchaser while the ordinance as a whole places responsibilities and penalties for the tax upon the seller of services, we will have effectively repealed, or deleted from our constitution, the requirement that authorization by the General Assembly must first be given before a home rule unit may impose taxes upon occupations. To approve the ordinance before us would, in effect, eliminate this limitation and deprive it of any meaning.

The debates reveal a serious concern that methods would be devised to circumvent the restrictions of section 6(e) of article VII. In the previous home rule tax cases discussed above, this court has often referred to section 6(m) of article VII as requiring liberal construction of home rule powers. We should not, however, through the guise of liberal construction, expand the taxing power of home rule

units to accomplish an evasion or circumvention of limitations specifically incorporated in the Constitution following lengthy and serious debate.

This holding does not, however, preclude units of local government from imposing taxes on service occupations. That authority can be granted to all municipalities or to home rule units alone by a simple enactment of a law by the General Assembly. In fact, as noted above, the Illinois Municipal Code now contains authorization for all cities to tax service occupations measured by the cost of tangible personal property transferred incident to the sale of service. (Ill. Rev. Stat. 1979, ch. 24, par. 8—11—5.) An amendment to this section broadening the means by which the tax is measured or the enactment of a separate authorization for home rule units to impose a tax on service occupations would comply with the requirements of section 6(e)(2) of article VII of our constitution.

The Committee on Local Government gave as one reason for the requirement of legislative authorization the prevention of the proliferation of occupation taxes at the local level in such large numbers as to impair the efficient operation of business within the State. (7 Proceedings 1673.) The wisdom of this reasoning becomes apparent when one considers the problems that one engaged in a service occupation would face if all home rule units were to adopt tax ordinances similar to the one the city of Chicago has adopted. The seller of services would be required to keep records for every home rule unit in which he provided services, and his books and records would be subject to audit by each. Authorization by the General Assembly for such taxes could provide a general overall, uniform method of correlating these taxes in the various home rule units and could prevent the overlapping and abuses that motivated the convention delegates to oppose taxes upon occupations. Also, the collection, distribution and enforcement of the local tax could be uniformly handled by a single agency, the

Department of Revenue, as is now provided in the Municipal Service Occupation Tax Act (Ill. Rev. Stat. 1979, ch. 24, par. 8—11—5).

For the reasons stated, we hold that the Chicago service tax is a tax "upon occupations," which is prohibited by section 6(e)(2) of article VII of our constitution, unless authorized by the General Assembly.

It is also contended that the ordinance is invalid because of certain exemptions. The ordinance includes a presumption that all services are taxable unless expressly exempted. (Municipal Code of Chicago §§ 200.5—8, 200.5—4 (1981).) The ordinance provides for various exemptions, including the following:

> "Provided that the foregoing service tax *shall not apply to the commodity or security business and no transaction tax shall, for a period of ten years* from the effective date of this ordinance, *be imposed upon any transaction upon a futures exchange* designated by the Commodity Futures Trading Commission *or a securities exchange* regulated by the Securities and Exchange Commission. (Emphasis added.) (Municipal Code of Chicago § 200.5—4 (1981).)

This proviso describes two exemptions from the service tax. The first exempts the commodities and securities businesses, the second exempts all transactions on a futures or securities exchange for a period of 10 years.

Although the city appears to suggest that the entire proviso exempts only transactions on exchanges, the trial court considered the exemption to apply to any transaction with the commodity or security business and gave no effect to the 10-year "moratorium." We find neither interpretation to be compelling. The clauses are each independent, and the meaning of either, standing alone, is plain. The first gives a general exemption from the "service tax" to commodities and securities businesses; the second exempts transactions on the exchanges from a "transaction tax" for a 10-year period. Where the meaning is certain and unambiguous, the

only legitimate function of this court is to give it effect as written. (See *Louis A. Weiss Memorial Hospital v. Kroncke* (1957), 12 Ill. 2d 98, 105.) The meaning of the proviso is thus: All services rendered by the commodities or securities businesses are exempted from the service tax, and for 10 years transactions on the exchanges cannot be subjected to a "transaction tax."

Among the constitutional objections raised to the tax is the argument that certain of the plaintiffs provide services to their clients which are substantially similar to those provided to clients of commodities and securities businesses which are not subjected to the tax. It is undisputed that the commodities and securities businesses provide substantial services to their clients in addition to those services which are unique to those businesses, such as providing investment advice, trading in United States government securities, selling commercial paper, managing accounts, bookkeeping, providing loans in both money and securities, underwriting stock and bond issues, and providing assistance with mergers and stock acquisitions. It is also undisputed that many of these same services are regularly provided by some of the various plaintiffs before us, particularly the financial institutions, accounting firms and law offices.

Section 2 of article IX of the 1970 Constitution provides:

"In any law classifying the subjects or objects of nonproperty taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable."
Ill. Const. 1970, art. IX, § 2.

Previous decisions of this court have held other exemptions from taxing provisions to be unconstitutional as violative of the uniformity requirement of the 1870 Constitution. (*Winter v. Barrett* (1933), 352 Ill. 441; *People ex rel. Holland Coal Co. v. Isaacs* (1961), 22 Ill. 2d 477; *Fiorito v. Jones* (1968), 39 Ill. 2d 531.) In none of these cases could the court find a reasonable difference between certain subclasses

which were exempted and the general class that was taxed. In this case, also, uniformity of taxation requires that there be a valid basis for discriminating in favor of the commodities and securities businesses or for considering them to be in a different class.

In support of the proviso, the city suggests that "the city council may have exempted the commodity and security business in order to create incentives for this type of business activity." However, *this type* of business activity includes both exempted and taxed subjects. Therefore, we find no basis in fact to distinguish between commercial competitors who provide substantially similar services. This is different from the situation in *Adler v. Illinois Bell Telephone Co.* (1978), 72 Ill. 2d 295, 297, in which this court upheld a tax which exempted interstate telephone calls. We stated the exemption might be justified as a method of attracting business into the city.

In *Winter v. Barrett* (1933), 352 Ill. 441, this court considered constitutional objections to an exemption contained in the sales tax act of 1933 that was granted to farmers who sold produce at retail. The court noted that the farmer who sold at retail was in direct competition with other nonfarm retailers of produce and found no basis in fact upon which the farmer could reasonably be placed in a different classification from the general class of those engaged in selling tangible personal property at retail. *Winter v. Barrett* (1933), 352 Ill. 441, 463.

The same reasoning applies to the case we are now considering. As noted earlier, the commodities and securities businesses provide many of the same services that are provided by some of the plaintiffs in this case. To that extent the commodities and securities businesses are competing with these plaintiffs. However, under the terms of the ordinance, if a purchaser procures the services from the commodities or securities businesses, no tax is imposed, whereas if identical services are purchased from the non-

exempt businesses, the tax must be paid. There is no apparent reason why a tax should be imposed upon those who purchase services from some of the plaintiffs while no tax is imposed on those who purchase the same services from the exempt businesses. There does not appear to be any real or substantial difference between those taxed and those not taxed which bears a reasonable relationship to the revenue-gathering purpose of the tax. (*Fiorito v. Jones* (1968), 39 Ill. 2d 531, 536.) All businesses providing services in Chicago share the benefits of the tax, but not all share the burden. The distinction is wholly arbitrary and cannot be upheld. We express no opinion as to an exemption in a more limited form and free from the factors present in this ordinance which require us to declare the exemptions unconstitutional.

Although the ordinance contains a severability clause, its presence is not necessarily conclusive as to whether the remainder of the ordinance can stand. (*Village of Oak Lawn v. Marcowitz* (1981), 86 Ill. 2d 406.) We find that the severability clause in this case does not save the remainder of the ordinance.

As stated by this court, the general test in determining whether an invalid part of a statute is severable so that the remainder of the statute may stand is as follows: "If what remains after the invalid portion is stricken is complete in itself and capable of being executed wholly independently of that which is rejected, the invalid portion does not render the entire section unconstitutional unless it can be said that the General Assembly would not have passed the statute with the invalid portion eliminated." (*Livingston v. Ogilvie* (1969), 43 Ill. 2d 9, 23; *City of Carbondale v. Van Natta* (1975), 61 Ill. 2d 483, 490; *Village of Oak Lawn v. Marcowitz* (1981), 86 Ill. 2d 406, 421.) In *Winter v. Barrett* (1933), 352 Ill. 441, 475-76, this court noted that the result of eliminating the void exemptions and provisions of an act imposing a tax upon all persons engaged in the business of selling tangible

personal property at retail was an act which imposed a tax upon all persons engaged in the businesses defined. The court stated: "[I]t is not the act the General Assembly passed or intended to pass, and hence the act under review, whole and entire, is void." 352 Ill. 441, 476.

The elimination of the invalid exemptions in our case would, as in the *Winter* case, result in the imposition of a tax upon persons whom the ordinance had exempted. We do not consider that the presence of the severability clause in the ordinance dictates a result different from that reached in *Winter*. While a severability or saving clause may be useful as an aid in determining legislative intent, it is not an "inexorable command" (*Carter v. Carter Coal Co.* (1936), 298 U.S. 238, 80 L. Ed. 1160, 56 S. Ct. 855), nor can it be considered conclusive (*Village of Oak Lawn v. Marcowitz* (1981), 86 Ill. 2d 406). Moreover, "it does not nullify any rule of statutory construction and must be applied in conformity with the rules of constitutional law." *City of Chicago Heights v. Public Service Co.* (1951), 408 Ill. 604, 611.

In *Ohio Oil Co. v. Wright* (1944), 386 Ill. 206, this court held invalid certain inclusions and exclusions of a tax on persons engaged in the business of producing oil. The act contained a severability clause which this court characterized as follows:

"It, in clear language, says that (a) if any provision is unconstitutional, or (b) if any of the producers mentioned therein are not taxable, then the legislature intends that such persons as are engaged in the business of producing oil shall pay the designated tax. In other words, if royalty holders are not taxable they shall be excluded; or, if producers, as defined, does not include all within the class, those not included shall be added. Literally interpreted this section would result in a new statute going into effect as a result of the judgment of this court deciding that either some classes were improperly included, or other classes improperly ex-

cluded. The new law would be created by this court and not by the General Assembly, because it enacted a different one. This would amount to a delegation of legislative powers to the courts, which is contrary to article III of the constitution, as well as numerous decisions of this court." 386 Ill. 206, 223.

In *Springfield Gas & Electric Co. v. City of Springfield* (1920), 292 Ill. 236, the court considered provisions of the Public Utilities Act which included certain exemptions which the court found to be invalid. The Act contained a severability clause. However the court held that to strike out the provisions containing exemptions and to hold the remainder of the Act valid would be making a law by this court that the legislature never intended to make. The court stated that the severability clause will not justify holding invalid the exceptions without affecting the act as a whole. While the severability clause may be some indication of legislative intent, in construing it the court must give due consideration to the rules heretofore laid down in the interpretation of statutes (292 Ill. 236, 244). The court essentially held that a severability clause is a declaration of established rules of statutory construction.

The general rule has been stated that if a proviso operates to limit the scope of the act in such a manner that by striking out the proviso the remainder of the statute would have a broader scope either as to subject or territory, then the whole of the act is invalid because such an extended operation would not be in accordance with the legislative intent as originally expressed in the enactment. 16 Am. Jur. 2d *Constitutional Law* § 271 (1979).

In our separation of powers scheme, courts are not the law-making branch of government. We determine only constitutional boundaries, not what is done within those boundaries. (*Dean Milk Co. v. City of Chicago* (1944), 385 Ill. 565, 572.) The net effect of allowing this ordinance to stand without the stricken portion would be to impose this

tax upon persons who purchase services from those engaged in the securities or commodities businesses. The new ordinance would be created by this court; it would be a substantially different law and tax from that enacted by the city council of Chicago. It would place a tax upon the classes specifically exempted in the original ordinance and whom it was the intent of the city council not to tax. It will not be the ordinance which the city council intended to pass. Such a tax cannot be imposed except through the legislative process. Despite the severability clause, the choice of whether to enact the ordinance without the invalid proviso or to turn to other sources of revenue is not ours to make. (See *Ohio Oil Co. v. Wright* (1944), 386 Ill. 206, 223; see also *Springfield Gas & Electric Co. v. City of Springfield* (1920), 292 Ill. 236, 245; *Minneapolis Federation of Teachers, Local 59 v. Obermeyer* (1966), 275 Minn. 347, 353, 147 N.W.2d 358, 363; *City National Bank v. Falkner* (Tex. Civ. App. 1968), 428 S.W.2d 429, 432, *writ of error refused* (Tex. 1968), 432 S.W.2d 689; 16 Am. Jur. 2d *Constitutional Law* § 271 (1979).) In a different factual setting the severability clause might be controlling, but it cannot be so regarded here, where its effect is to delegate taxing powers to the courts. *Ohio Oil Co. v. Wright* (1944), 386 Ill. 206, 223.

Plaintiffs also claim that the ordinance exceeds the home rule powers of section 6(a) of article VII, in that it has extraterritorial effect. This argument focuses on section 200.5—3, which, in relevant part, states:

"Section 200.5—3. *** A purchase of service is in the City if either (a) the purchaser is in the City at the time the service is provided, or (b) the seller is in the City at the time the service is provided, and (c) the service is substantially performed, rendered, provided, and received or used in the City. A service shall be deemed substantially performed, rendered or provided in the City if 50% or more of the work performed or of the cost incurred by the seller in connection

therewith occurs within the City; a service shall be deemed substantially received or used in the City if 50% or more of the benefits thereof are realized by the purchaser in the City."

Plaintiff Johnson, a Rockford attorney with Chicago clients, urges that, as a nonresident seller of services to Chicago purchasers, he cannot be required to pay and collect the tax where the events involved in performing the service occur outside the city of Chicago. Under this ordinance, the tax is imposed if the purchaser or seller is in the city at the time the service is provided and 50% or more of the work is performed or 50% or more of the cost is incurred in the city. It cannot be doubted that this ordinance has extraterritorial effects for both purchasers and sellers of service. A nonresident purchaser would be liable for the tax even though his only contact with the city might be through dealings with sellers of service "in the city." A nonresident purchaser could contract with a nonresident seller of service and if that seller "substantially performs" the service in the city both are then liable for the tax on the entire transaction. To "substantially perform" the service in the city, the seller need only perform 50% of the work or incur 50% of the cost in the city, but the tax would be on the total value of the services. This is a clear attempt by the city of Chicago to give extraterritorial effect to its ordinance and to tax services that have no connection with the taxing city.

That home rule units do not possess extraterritorial governmental powers was decided in *City of Carbondale v. Van Natta* (1975), 61 Ill. 2d 483. In *Van Natta,* after outlining the powers granted to home rule units in section 6(a) of article VII, this court stated:

"At the constitutional convention the Committee on Local Government recommended that the grant of powers in section 6(a) contain the specifically limiting wording 'within its corporate limits.' (7 Record of Proceedings, Sixth Illinois Constitutional Convention 1577 (hereinafter cited as Proceedings).) Though the

language was not used when the section was adopted (4 Proceedings 3125), an examination of the proceedings of the convention shows that the intention was not to confer extraterritorial sovereign or governmental powers directly on home-rule units. The intendment shown is that *whatever extraterritorial governmental powers home-rule units may exercise were to be granted by the legislature.* See 4 Proceedings 3040-41, 3072-75. * * *." (Emphasis added.) (*City of Carbondale v. Van Natta* (1975), 61 Ill. 2d 483, 485.)

There is no contention here that this ordinance was adopted pursuant to authority granted by the General Assembly.

In our judgment, Chicago's imposition of tax liability or tax-collection duties upon nonresident purchasers and sellers of services performed *outside* the city is incompatible with the intent of the drafters of our constitution as determined in *Van Natta.* It is not that nonresidents of a home rule unit could never be subjected to taxation by that home rule unit. Rather, under the definition of "purchase of service" and "substantially performed," this ordinance permits taxation upon services not rendered or performed in the territorial jurisdiction of the taxing entity. (See *City of Evanston v. Create, Inc.* (1981), 85 Ill. 2d 101.) In *Mulligan v. Dunne* (1975), 61 Ill. 2d 544, it was the sale of alcoholic beverages *within the county* which was being taxed. We indicated there that it was not an extraterritorial exercise of home rule powers to impose tax-collection duties upon a nonresident wholesaler who did business within the county. Therefore, *Mulligan* does not support the city's position. In all our previous decisions on the home rule units' taxing power, the commodities or services taxed were purchased or used within the territorial limits of the taxing entity. Here, the ordinance purports to tax not only services performed in the city, but also services performed outside the city.

Considering the number of local governmental units in this State, particularly in and around the Chicago area,

which possess or could elect to possess home rule powers, it is apparent that unrestrained extraterritorial exercise of those powers in zoning, taxation and other areas could create serious problems. (4 Proceedings 3072-75, 3119-25.) If we were to rule this tax ordinance constitutional, each home rule unit in the State of Illinois could pass a similar ordinance. The drafters of our constitution limited the extra-territorial exercise of home rule powers to those enacted by the General Assembly, and the General Assembly has the power to limit the extent of such grants of power as may be necessary.

Therefore, it was not within the power of the Chicago city council to define when a "purchase of service is in the City" or "substantially performed" so as to give extraterri-torial effect to its taxing ordinance. That portion of section 200.5—3 defining when a purchase of services is in the city is unconstitutional because that definition exceeds the terri-torial limitations upon home rule powers found in section 6(a) of article VII of our constitution of 1970.

In view of our holding the ordinance unconstitutional on other issues, we need not decide the question of whether or not the ordinance constitutes regulation of service occu-pations. It has been argued that the extensive obligations which the ordinance places upon the seller of services constitute regulation of these businesses, many of which the General Assembly has preempted home rule power to regulate. In *Board of Education v. City of Peoria* (1979), 76 Ill. 2d 469, this court held that the obligations and duties which the ordinance imposed upon the board of education were not authorized under the grant of home rule power. The court noted that the constitution vested the General Assembly with plenary power over school districts. (*Board of Education v. City of Peoria* (1979), 76 Ill. 2d 469, 475-77.) Sections 6(g) and 6(h) of article VII of the Constitution provide means whereby the General Assembly may pre-empt home rule powers. Legislation has been enacted

preempting home rule authority over numerous service occupations. (See Ill. Rev. Stat. 1979, ch. 111, par. 1203 (architects), par. 1839 (beauticians), par. 2255 (dentists and dental hygienists), par. 2432 (detection of deception examiners), par. 2639 (private detectives), par. 3234 (land surveyors), par. 3437 (nurses), par. 3632 (nursing home administrators), par. 3833 (optometrists), par. 4053 (pharmacists), par. 4231 (physical therapists), par. 4477 (physicians), par. 4942 (podiatrists), par. 5136 (professional engineers), par. 5329 (psychologists), par. 5536 (public accountants), par. 5742 (real estate brokers and salesmen), par. 6133 (shorthand reporters), par. 6325 (social workers), par. 6727 (tree experts), par. 6929 (veterinarians), par. 7130 (pump installation contractors).) This list is representative and not intended to be exhaustive. We need not in this opinion decide whether or not the Chicago service-tax ordinance infringes upon the exclusive regulation of these occupations which the State has reserved to itself.

In summary, we hold that this ordinance imposes an unconstitutional tax upon occupations prohibited to home rule units, absent approval by the General Assembly, under article VII, section 6(e), of our constitution of 1970. We also hold this ordinance unconstitutional due to its unseverable exemption of the "commodity and security business" in violation of the uniformity provision of section 2 of article IX. Finally, we hold that portion of section 200.5—3 of the ordinance which defines when a purchase takes place in the city unconstitutional as exceeding the territorial limitations of the city's home rule powers. The judgment of the circuit court of Cook County is reversed.

*Judgment reversed.*

JUSTICE UNDERWOOD, concurring in part and dissenting in part:

I concur only in that portion of the majority's opinion which holds unconstitutional the extraterritorial application

of the ordinance. I do so not only because home rule units have no extraterritorial powers, but also because its extraterritorial application would pose severe due process problems. (See *National Bellas Hess, Inc. v. Department of Revenue* (1967), 386 U.S. 753, 18 L. Ed. 2d 505, 87 S. Ct. 1389; *Nelson v. Sears, Roebuck & Co.* (1941), 312 U.S. 359, 85 L. Ed. 888, 61 S. Ct. 586; *Nelson v. Montgomery Ward & Co.* (1941), 312 U.S. 373, 85 L. Ed. 897, 61 S. Ct. 593.) I would uphold the remainder of the ordinance as a valid exercise of the city's home rule authority under article VII, section 6(a), of the 1970 Constitution.

The majority's holding that this is a prohibited occupation tax is basically a reiteration and expansion of Mr. Justice Ryan's dissent in *Paper Supply Co. v. City of Chicago* (1974), 57 Ill. 2d 553, 583. The late Mr. Justice Davis and I joined in that dissent, for I was convinced that the tax in *Paper Supply* was a tax " 'upon or measured by income or earnings or *upon occupations*' " and thus prohibited by section 6(e) of article VII of our 1970 constitution unless specifically authorized by the General Assembly. Our views did not prevail, however, and I subsequently accepted, as a dissenting judge must, the majority's interpretation of the constitutional provision (see *People v. Lewis* (1981), 88 Ill. 2d 129, 165, 166, 167 (Goldenhersh, C.J., and Ryan and Clark, JJ., concurring)).

Since then opinions in cases indistinguishable in legal principle from the one now before us were written and adopted in reliance upon the rationale of *Paper Supply.* (*Kerasotes Rialto Theater Corp. v. City of Peoria* (1979), 77 Ill. 2d 491; *Town of Cicero v. Fox Valley Trotting Club, Inc.* (1976), 65 Ill. 2d 10; *Mulligan v. Dunne* (1975), 61 Ill. 2d 544.) Undoubtedly, tax ordinances have been adopted by unknown numbers of home rule units in reliance upon those cases. While the majority opinion attempts to minimize the possibility of challenges to those ordinances by indicating that all of our earlier decisions involved different and

distinguishable facts and taxes, even a cursory reading of those cases will, in my judgment, demonstrate the fallacy of that statement. Apparently, however, because this tax is viewed as particularly undesirable it is now stricken, in part on the ground that it is a prohibited occupation tax. The opinion so holding is, in my judgment, simply incompatible with our earlier opinions and totally inconsistent with *S. Bloom, Inc. v. Korshak* (1972), 52 Ill. 2d 56 and *Jacobs v. City of Chicago* (1973), 53 Ill. 2d 421, among others.

In *Paper Supply,* the  court held that the Chicago employers' expense tax ordinance which imposed a $3 per month tax upon employers who employed 15 or more individuals as commission merchants or full-time employees was not an occupation tax in violation of article VII, section 6(e), of the 1970 Constitution. The court reached this conclusion after determining that the delegates had not intended that the term "tax upon occupations" be defined any differently than this court had previously defined "occupation tax," and after noting that the Constitution requires that we resolve the question in favor of a broad rather than a narrow interpretation of a home rule unit's taxing power. Ill. Const. 1970, art. VII, § 6(m).

Our long-standing definition of an occupation tax which would be beyond the power of a home rule unit to enact, absent express authorization by the General Assembly, is as follows:

"[A]n occupation tax has one of two missions: either to regulate and control a given business or occupation, or to impose a tax for the privilege of exercising, undertaking or operating a given occupation, trade or profession. Its effect is to license a person engaged in a given calling or occupation. *** The payment of the tax itself is a condition precedent to the privilege of carrying on a business or occupation." *Reif v. Barrett* (1933), 355 Ill. 104, 109.

The Chicago service tax ordinance is not designed to regulate or to impose a tax upon any given occupations; its

purpose is to impose a tax on one who purchases service from an individual or entity in the city of Chicago. It includes within its scope a broad range of services without regard to the occupational status of those providing the service. (See *Town of Cicero v. Fox Valley Trotting Club, Inc.* (1976), 65 Ill. 2d 10, 22-23.) The ordinance specifies that the tax imposed and the obligation to pay is upon the purchaser. That burdens connected with or related to the tax fall upon those engaged in occupations is neither unique to this ordinance nor sufficient to make the tax one on occupations: an "ordinance must be designed to impose, and in fact impose, a tax upon given occupations." (*Town of Cicero v. Fox Valley Trotting Club, Inc.* (1976), 65 Ill. 2d 10, 23; see also *S. Bloom, Inc. v. Korshak* (1972), 52 Ill. 2d 56, 63 ("Where the economic burden of a tax may fall is not a circumstance affecting the question where its legal incidence rests").) I recognize that those who provide services in the city of Chicago engage in various occupations and callings, but when the legal incidence of a tax is expressly placed on the purchaser of the services, and the ordinance is not otherwise designed to *regulate* or *control* those providing the services, it cannot fairly be characterized as an occupation tax. *Town of Cicero v. Fox Valley Trotting Club, Inc.* (1976), 65 Ill. 2d 10, 23.

Our recent decision in *Estate of Carey v. Village of Stickney* (1980), 81 Ill. 2d 406, does not compel a different result. In *Stickney,* a divided court held that a 1974 Stickney tax ordinance which required racetrack licensees to pay a 10-cent tax for each person who purchased a ticket of admission was a tax imposed upon those licensed to conduct racing meets and was therefore an unconstitutional occupation tax. Although the dissenters believed that the tax was virtually identical to that upheld in *Fox Valley,* the majority found that the legal incidence of the tax was upon those licensed to conduct racing meets, thereby distinguishing our prior decisions in which the legal incidence of the tax was

expressly placed on the consumer. It seems clear to me that the Chicago service tax, unlike the tax in *Stickney,* places the legal incidence of the tax on the purchaser of services and under our earlier decisions is not an occupation tax.

The collection methods and the penalty provisions in this ordinance are not novel and do not otherwise affect the nature of the tax. In S. *Bloom, Inc. v. Korshak* (1972), 52 Ill. 2d 56, this court held that the Chicago cigarette tax ordinance was not an occupation tax though the ordinance placed the collection responsibility upon wholesalers and retailers. Since the legal incidence of the tax was placed on the consumer, the wholesalers and retailers merely served as collection agents. (To the same effect are *Mulligan v. Dunne* (1975), 61 Ill. 2d 544; *Jacobs v. City of Chicago* (1973), 53 Ill. 2d 421; *Kerasotes Rialto Theater Corp. v. City of Peoria* (1979), 77 Ill. 2d 491.) Similarly, penalty provisions here simply insure the integrity of the collection procedures; they are not significant in determining where the incidence of the tax rests. S. *Bloom, Inc. v. Korshak* (1972), 52 Ill. 2d 56, 63; *Jacobs v. City of Chicago* (1973), 53 Ill. 2d 421, 424.

At this late date, there is no justification for the majority's return to the constitutional debates to determine the question of whether this tax is "upon occupations," as that term is used in section 6(e)(2) of article VII of the Constitution. Both the majority and dissenting opinions in *Paper Supply* exhaustively reviewed the convention proceedings to determine the delegates' intention, and a majority of this court came to a conclusion opposite to that reached by today's majority as to that intention. The majority's departure today from this court's consistent line of decisions undermines any stability and uniformity heretofor existing in the area of home rule taxing authority under our constitution.

I do not agree that the "commodity and security" exemption is unconstitutional and would, by itself, render the entire ordinance invalid. In my judgment, the majority's

approach to the constitutionality of this proviso is fundamentally wrong and in derogation of elementary rules of statutory construction. Those rules require this court to construe the ordinance so as to sustain its constitutionality if such a construction is a reasonable alternative. (*Illinois Polygraph Society v. Pellicana* (1980), 83 Ill. 2d 130, 137; *Anderson v. Schnieder* (1977), 67 Ill. 2d 165, 176; *Board of Education v. Ellis* (1975), 60 Ill. 2d 413, 416; see also *Environmental Protection Agency v. Pollution Control Board* (1981), 86 Ill. 2d 390, 401-02.) Since we presume that a legislative body acts in view of the Constitution and does not intend the enactment of a void law (*Illinois Crime Investigating Com. v. Buccieri* (1967), 36 Ill. 2d 556, 561; *Pliakos v. Illinois Liquor Control Com.* (1957), 11 Ill. 2d 456, 459-60), all doubts or uncertainties arising from the language of the act must be resolved in favor of its validity. (*S. Bloom, Inc. v. Korshak* (1972), 52 Ill. 2d 56, 64-65; *People v. Newcom* 1925), 318 Ill. 188, 190.) While it is true, as the majority points out, that this court's function is to give effect to a provision as written, this is so only if its meaning is *certain* and *unambiguous* (*Belfield v. Coop* (1956), 8 Ill. 2d 293, 307) or free from doubt (*Weiss Memorial Hospital v. Kroncke* (1957), 12 Ill. 2d 98, 105). Where an ordinance under attack is open to a *dual* construction, this court has uniformly held that we will adopt a construction that sustains its validity (*e.g., People ex rel. Dolan v. Dusher* (1952), 411 Ill. 535, 540; *Progressive Party v. Flynn* (1948), 400 Ill. 102, 112; *City of Benton v. Blake* (1914), 263 Ill. 358, 360), particularly where that construction has been adopted by the enacting body (*Environmental Protection Agency v. Pollution Control Board* (1981), 86 Ill. 2d 390, 403).

· The disputed provision, admittedly poorly drafted, is susceptible of two constructions. It states:

"Provided that the foregoing service tax shall not apply to the commodity or security business and no transaction tax shall, for a period of ten years from the

effective date of this ordinance, be imposed upon any transaction upon a futures exchange designated by the Commodity Futures Trading Commission or a securities exchange regulated by the Securities and Exchange Commission."

Literal enforcement of the first clause of the proviso in conjunction with the second clause would lead to the illogical result of indefinitely exempting from the tax persons who purchase service from anyone associated with the entire commodity or security industry, yet limiting to only a 10-year exemption persons who purchase service from those engaged in the industry for *exchange transactions.* At the end of the 10-year period, exchange purchasers would presumably be subject to the tax, yet they would remain exempt from the tax by virtue of the only then-existing provision—the first clause of the proviso. It is not reasonable to believe that the city council of Chicago intended such result. (See *Halberstadt v. Harris Trust & Savings Bank* (1973), 55 Ill. 2d 121 (we presume a legislative body did not intend an absurdity or illogical result); see also *People v. Warren* (1977), 69 Ill. 2d 620, 628.) Moreover, if this interpretation is to be accepted, we would have to believe that the city council determined it would tax exchange purchasers in 10 years but allow purchasers who deal with anyone else connected with the securities business to remain exempt. There is no logic in such a scheme, and I would therefore reject the plaintiffs' contention that this provision was intended as a blanket exemption of all purchasers who purchase any type of service from those engaged in the commodity or security business.

A second possible construction of the proviso and that given it by the city, which would have been charged with its enforcement, is that the exemption relates only to exchange transactions and only for a 10-year period. Such construction is a considerably more reasonable one, consistent with the established rules of statutory construction and this

court's obligation to give the product of the city council of Chicago a constitutional meaning, if possible. The majority's *broad* interpretation of the exemption necessarily forces the conclusion that it is unconstitutional. In view of the cited rules, such an interpretation is manifestly erroneous.

Under the more narrow and reasonable interpretation placed upon this provision by the enacting body, it is apparent that it can withstand constitutional scrutiny. That a legislative body has broad powers to establish reasonable classifications in defining taxation is well settled. (*Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 35 L. Ed. 2d 351, 93 S. Ct. 1001; *Williams v. City of Chicago* (1977), 66 Ill. 2d 423, 432; *Fiorito v. Jones* (1968), 39 Ill. 2d 531, 535; *People ex rel. Holland Coal Co. v. Isaacs* (1961), 22 Ill. 2d 477.) Such bodies may define a general class which is subject to a tax and then specifically remove a subclass so long as the classification is based upon real and substantial differences between those taxed and those not taxed. (*Fiorito v. Jones* (1968), 39 Ill. 2d 531, 535-36; *City of Chicago v. Ames* (1937), 365 Ill. 529.) Where the exemption takes its character from an entity other than that upon which the incidence of the tax has been placed, it is not objectionable so long as there is a reasonable basis for differentiating between such entities. (*Kerasotes Rialto Theater Corp. v. City of Peoria* (1979), 77 Ill. 2d 491, 496-97.) The presumption favoring the validity of classifications in the area of taxation places the burden on the one attacking such classification to negate every conceivable basis which might support it. (*Williams v. City of Chicago* (1977), 66 Ill. 2d 423, 433, citing *Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 364, 35 L. Ed. 2d 351, 358, 93 S. Ct. 1001, 1006.) The classification must therefore be upheld if any state of facts may reasonably be conceived that would sustain it. *Department of Revenue v. Warren Petroleum Corp.* (1954), 2 Ill. 2d 483, 490.

The determination by the city council of Chicago to

exempt exchange transactions from the tax appears neither arbitrary nor unreasonable. It may have deemed it initially impractical or unduly burdensome to impose a tax on such transactions, choosing instead to allow for a 10-year moratorium. Too, it may have desired to attract such commerce to Chicago. (See *Adler v. Illinois Bell Telephone Co.* (1978), 72 Ill. 2d 295, 297.) It is also conceivable that the potential conflict with Federal regulations in this area might have influenced the city council's decision to grant, at least initially, such an exemption. Moreover, there is a distinct difference between the services otherwise subject to the tax and those exempted under this provision. (See *Williams v. City of Chicago* (1977), 66 Ill. 2d 423.) These considerations furnish sufficient justification for exempting from the tax those purchasers who purchase services for security- or commodity-exchange transactions. The exemption does not, therefore, violate the uniformity clause of the State Constitution (Ill. Const. 1970, art. IX, § 2) or the fourteenth amendment to the Federal Constitution.

The majority goes on to conclude that the invalidity of this exemption, under their broad interpretation of its meaning, would render the ordinance void in its entirety. Even assuming the commodity and security exemption to be invalid, that determination should not defeat the ultimate validity of the tax. The best indication of the city council's intent is the language it voted to adopt. (*Coryn v. City of Moline* (1978), 71 Ill. 2d 194, 200; *General Motors v. Industrial Com.* (1975), 62 Ill. 2d 106, 112.) That language could not be clearer. The severability clause provides:

"Section 2. If any provision of this Chapter or application thereof to any person or circumstance is held unconstitutional or otherwise invalid, such invalidity does not affect other provisions or applications of this Chapter which can be given effect without the invalid application or provision, and to this and each such invalid provision or invalid application of this Chapter is severable, unless otherwise provided by this Chap-

ter. *In particular, but without limitation, each provision creating an exception to or an exemption or exclusion from the imposition of the tax is severable.* It is hereby declared to be the legislative intent of the City Council that this Ordinance would have been adopted had any such unconstitutional or otherwise invalid provision or application not been included." (Emphasis added.)

While it is true that a severability clause is not conclusive (*Village of Oak Lawn v. Marcowitz* (1981), 86 Ill. 2d 406), there exists no rule of construction authorizing a court to declare that a legislative body does not mean what its plain language says. *Christian Action Ministry v. Department of Local Government Affairs* (1978), 74 Ill. 2d 51, 57; *Franzese v. Trinko* (1977), 66 Ill. 2d 136, 139-40.

The rules of construction which should be utilized in conjunction with this severability clause are also misconstrued by the majority. It is apparent to me that this exemption proviso is not so mutually connected with and dependent upon the other provisions of the ordinance as to make it inseparable. (See *Fiorito v. Jones* (1968), 39 Ill. 2d 531, 540.) It is wholly independent of the *substance* of the ordinance. Moreover, as the majority correctly notes, in order to render the entire ordinance invalid we must be able to say that the city council *would not* have passed this ordinance with the exemption eliminated. (*Village of Oak Lawn v. Marcowitz* (1981), 86 Ill. 2d 406, 421; *City of Carbondale v. Van Natta* (1975), 61 Ill. 2d 483, 490.) The significance of framing the issue in this fashion is more than mere semantics. It defines the burden. The plaintiffs must show this to be the legislative intent. In view of the severability clause and the independent nature of this proviso, it is incumbent upon the plaintiffs to demonstrate that the city council would not have passed this ordinance without the exemption. There is simply nothing in this record which so indicates.

Finally, the majority determines that upholding this

ordinance after invalidating the exemption is tantamount to the court's creating a new ordinance in which the court imposes a tax upon the purchasers of services from securities and commodities brokers. Such a characterization is mistaken; reliance upon cases cited is misplaced. In *Ohio Oil Co. v. Wright* (1944), 386 Ill. 206, 223, the court struck down a provision of the Oil Production Tax Act which provided for an alternative classification under which the tax would be applied should another provision of the Act be declared unconstitutional. In *Springfield Gas & Electric Co. v. City of Springfield* (1920), 292 Ill. 236, the court struck out a provision exempting municipalities from the Public Utilities Act and declared that to hold the remainder of the Act valid would nullify a large portion of the Municipal Ownership Act which the legislature intended should remain intact and operable. Those situations are not analogous to the one at hand. Here the legislative intent is that "this ordinance would have been adopted had any such unconstitutional or otherwise invalid provision or application not been included." We would not be creating an "alternate" classification. We would not be engaging in a legislative function by severing an invalid exemption. On the contrary, we would and should be following the plain language of this ordinance in accurately interpreting this provision as an indisputable expression of the legislative intent.

Lastly, I cannot approve of the majority's apparent dictum that this ordinance may also constitute an impermissible regulation of various professionals. Plaintiffs rely primarily upon *Board of Education v. City of Peoria* (1979), 76 Ill. 2d 469, which I consider inapposite.

In *City of Peoria* this court held that the ordinance in question constituted an impermissible regulation on the school district in direct contravention of section 1 of article X of the 1970 Constitution. Pursuant to that constitutional mandate, the legislature exercises plenary power over the Illinois school system and has enacted a comprehensive

scheme which describes in detail the powers, duties and obligations of school boards. The record-keeping, reporting and other obligations imposed under the ordinance were held to constitute an unauthorized regulation of the school district because they imposed duties and conferred powers on the board over and above those specified in the comprehensive statutory scheme. Our constitution contains no similar mandate regarding the professional plaintiffs before us.

While it is firmly established that the power to regulate and define the practice of law is a prerogative of the judicial department as one of the three divisions of government created by our constitution (*Lozoff v. Shore Heights, Ltd.* (1977), 66 Ill. 2d 398, 401-02; *In re Anastaplo* (1954), 3 Ill. 2d 471, 475; *People ex rel. Chicago Bar Association v. Goodman* (1937), 366 Ill. 346, 349; *In re Application of Day* (1899), 181 Ill. 73), it does not follow that the Constitution prohibits a home rule unit from legislating in such a manner as to impose incidental obligations and burdens upon attorneys. The Constitution expressly confers upon a home rule unit the power to tax, except as specifically limited, and a necessary corollary of the taxing power is the power to establish reasonable collection procedures. The ordinance is a taxing measure enacted pursuant to the city's power under the Constitution, and the provisions imposing duties and sanctions upon the tax collector do not serve to convert the tax into a license for revenue or a regulatory measure. See *Paper Supply Co. v. City of Chicago* (1974), 57 Ill. 2d 553, 576; *Jacobs v. City of Chicago* (1973), 53 Ill. 2d 421.

Contrary to the majority's conclusion, the statutory provisions governing the other professionals represented here *do not* evidence a legislative intent to exercise plenary power over *every* aspect of these professions. Without exception, the statutes provide that "any power or function *set forth in this Act* to be exercised by the State is an exclusive State power or function." (See Ill. Rev. Stat. 1979,

ch. 111, par. 1203 (architects); par. 2255 (dentists); par. 4477 (physicians); par. 5536 (public accountants).) Since I do not see this ordinance as an attempt to regulate any profession, I cannot agree with the plaintiffs that they are immune from incidental tax-collecting and record-keeping responsibilities.

In conclusion, I must say that I too share the belief of some of my colleagues that this is an undesirable form of tax which will be difficult to enforce, but it is not within the scope of the judicial function to determine the social utility or feasibility of legislative decisions so long as they remain within constitutional limits (*People ex rel. City of Canton v. Crouch* (1980), 79 Ill. 2d 356, 370). Except for that portion of section 200.5—3 defining when a purchase of service is in the city, which I also believe exceeds the city's territorial authority, I would uphold this ordinance as a constitutional exercise of the city's taxing power.

GOLDENHERSH and CLARK, JJ., join in this partial concurrence and partial dissent.